**PIONEER COMMERCIAL FUNDING CORP. and Bank One, Texas, N.A.**

**v.**

**AMERICAN FINANCIAL MORTGAGE CORP., Thomas F. Flatley, Northwest Funding, Inc. and CoreStates Bank, N.A.**

**Appeal Of: CoreStates Bank, N.A.**

Superior Court of Pennsylvania.

Argued Nov. 29, 2001.

Filed March 18, 2002.

Reargument Denied May 21, 2002.

---

Paul H. Titus, Pittsburgh, and Andrew L. Frey, New York, NY, for CoreStates Bank, appellant.

Maurice R. Mitts, Philadelphia, and Ronald Mann, Ann Arbor, MI, for Pioneer Commercial, appellee.

Christopher J. Day, Philadelphia, for Greater Philadelphia Chamber of Commerce, amicus curiae.

Before JOHNSON, JOYCE and BECK, JJ.

JOYCE, J:

¶ 1 Appellant, CoreStates Bank, N.A.

(Bank),[1] appeals from the judgment entered by the trial court on December 21, 2000,[2] following a jury verdict in favor of Appellee, Pioneer Commercial Funding Corporation (Pioneer). For the reasons set forth herein, we affirm in part and reverse in part.

■ ¶ 2 The pertinent facts and procedural history of this case are as follows. Appellee, Pioneer, is a mortgage funding company, a warehouse lender. Pioneer had a business relationship with RNG Mortgage Services, Inc. (RNG), a California-based mortgage banker. A May 1997 agreement governing the business relationship provided that Pioneer would receive a security interest in the notes and mortgages obtained by RNG (the collateral) and in any proceeds of the notes and mortgages. In order to protect Pioneer's interest in the notes, RNG ordinarily would endorse the notes in blank and deliver them to Pioneer, which in turn, delivered the notes to Bank One, Texas (Bank One). Bank One would then send the individual notes under bailee letters,[3] releasing them from its custody as they were paid by the ultimate secondary-market investors that purchased them. RNG "originated" mortgages, i.e., loaned money to home buyers and sold the resulting notes and mortgages to investors such as Pioneer. As a warehouse lender, Pioneer advanced money to RNG so that RNG could fund loans to homebuyers. On its part, Pioneer derived its funding from Bank One.

¶ 3 In August 1997, RNG filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. American Financial Mortgage Corporation (AFMC), a mortgage originator, upon learning of RNG's bankruptcy, entered into negotiations to acquire RNG. AFMC then persuaded Pioneer to continue its funding of RNG's consumer loans so as to keep open RNG's pipeline of unfunded mortgage commitments. Pioneer, RNG, and AFMC then entered into a loan and security agreement, with Pioneer as the lender and AFMC as the borrower. Thomas Flatley, AFMC's principal, guaranteed AFMC's obligations under the agreement. Under the agreement, Pioneer would continue funding RNG's loans as long as RNG was able to locate investors to purchase them. RNG and AFMC then obtained commitments from Norwest Funding, Inc. (Norwest). The commitments meant that Norwest would purchase the RNG loans that Pioneer funded. Due to the fact that RNG was in bankruptcy, as a condition for its commitments, Norwest insisted that AFMC guarantee the performance of the homeowners on the underlying notes, which AFMC did. The net effect of this complex arrangement is that the notes would be sent from Bank One to AFMC

1. CoreStates Bank was acquired by First Union National Bank in April 1998. The parties stipulated that all claims and defenses of CoreStates would apply to First Union. Thus, we will refer to both First Union and CoreStates collectively as the "Bank."

2. Although the judgment was entered on the docket on December 20, 2000, pursuant to Pa.R.C.P. 236, notice of the order was sent to the parties on December 21, 2000. *See* Pa. R.A.P. 108(b) (the date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation on the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)). Pa.R.C.P. 236 provides that the prothonotary shall immediately give written notice of the entry of any order, decree or judgment to each party's attorney of record.

3. A bailee letter is a legal mechanism that allows a secured creditor to release possession of a negotiable instrument such as a note, without losing the perfected status of its interest in the collateral.

under a bailee letter; AFMC would endorse the notes and send them along with the bailee letter to Norwest; and Norwest would then wire the funds directly to Pioneer's account at Bank One. Norwest was given wiring instructions to wire the funds to Pioneer's account at Bank One.

### The First Transaction (The First Portfolio):

¶ 4 Pursuant to this elaborate and complex arrangement, RNG obtained notes from title companies, endorsed them in blank and sent them to Pioneer. Pioneer then sent the notes to Bank One. Bank One later sent the notes, along with the bailee letter[4] to AFMC. Upon receiving these items, AFMC endorsed the notes and sent them, along with other documents to Norwest, Norwest having previously agreed to purchase approximately $2.3 million worth of RNG-originated loans (First Loan Portfolio). Norwest then inspected the notes and wired approximately $2.1 million to AFMC's account at the Bank. This wire transfer took place on November 4, 1997. Norwest wired the funds to AFMC's account despite the parties' agreement and understanding that the funds should be wired directly to Pioneer's account at Bank One. Shortly after learning that Norwest did not wire the funds to the expected account, an official of RNG, Melanie Hotz, and Glenda Klein of Pioneer, quickly informed AFMC of this situation. As a result, AFMC requested the Bank to wire the funds to Pioneer's account at Bank One. The Bank promptly complied with AFMC's request and wired the funds to Bank One.

### The Second Transaction (The Second Portfolio):

¶ 5 Again, pursuant to the parties' arrangement, the second loan transaction proceeded like the first one. At a later stage of the transaction, AFMC sent the notes to Norwest. Prior to this second transaction, representatives of RNG, Pioneer and AFMC contacted Norwest to ensure that the payments would be sent to Pioneer's account at Bank One rather than AFMC's account at the Bank. Despite the instructions to the contrary, AFMC, of its own accord, later sent wiring instructions to Norwest to wire the funds to AFMC's account at the Bank.

¶ 6 On November 12, 1997, Norwest wired $1,454,699.80 to AFMC's account at the Bank. Norwest subsequently wired other funds to the above account on two other occasions: November 13, 1997 ($209,984.33), and November 19, 1997 ($114,835.86). The amounts wired by Norwest to AFMC's account at the Bank totaled $1,779,519.99 (the Fund). Part of this amount was the remaining payment for the First Portfolio while the remainder was applied to the payment for the Second Portfolio.

¶ 7 Unbeknownst to Pioneer, RNG, and Bank One, AFMC had become indebted to the Bank in excess of $4 million through overdrafts. On November 6, 1997 the

---

**4.** The bailee letter stated as follows: "The enclosed notes ... and other documents ("collateral") ... have been assigned and pledged to (a) Pioneer Commercial Funding Corp., ("borrower") as collateral under a loan and security agreement.... The collateral is being delivered to you for a purchase under the existing take out commitment.... Either payment in full for the collateral or the collateral itself must be received within 45 days after the date of this letter. Until that time you are deemed to be holding the collateral in trust, subject to the security interest granted first to borrower and then to agent for lenders and as agent's bailee in accordance with the applicable provisions of the Uniform Commercial Code.... Payment for collateral must be made by wire transfer or immediately available funds to: Bank One, Texas N.A., agent account ... credit: Pioneer Commercial Funding Corp...."

Bank imposed a debit restraint on all the accounts of AFMC and its affiliates, meaning that AFMC and its affiliates could deposit but could not withdraw funds from these accounts.

¶ 8 On November 25, 1997, AFMC notified the Bank that Norwest had wrongly deposited $1,779,519.99 (the Fund) into AFMC's account at the Bank. Norwest also requested the Bank to reverse the wire transfers sent to AFMC's account. Despite these notifications, the Bank claimed that it had already exercised its right to setoff the amount deposited into AFMC's account against the amount owed by AFMC through overdrafts. The Bank and Thomas Flatley of AFMC subsequently entered into a workout agreement under which the Bank would retain the money deposited by Norwest. Pioneer was not informed of this agreement. Pioneer then sought to recover the money from the Bank, claiming that Norwest deposited the money into AFMC's account in error.

¶ 9 Following the Bank's refusal to forward the Fund to Pioneer upon request, on April 20, 1998, Pioneer initiated this action through the filing of a complaint alleging that the Bank committed the tort of conversion. The named defendants were the Bank, AFMC, Thomas F. Flatley, and Norwest. The case proceeded to a jury trial on June 2, 2000. The trial was conducted in a bifurcated fashion consisting of the liability phase followed by the damages phase. On July 26, 2000, after deliberation, the jury found the Bank liable for conversion and returned a verdict in favor of Pioneer in the following amounts: $1,779,519.99 (compensatory damages), $13.5 million (consequential damages) and $337.5 million (punitive damages).

¶ 10 On August 28, 2000, the Bank filed post-trial motions seeking judgment notwithstanding the verdict (JNOV) and a new trial or remittitur. On December 4, 2000, the trial court denied the Bank's motion for JNOV and for a new trial. The trial court however, granted the remittitur, reducing the punitive damages to $40.5 million. On December 21, 2000, after including the interest on the compensatory damages award, the trial court entered judgment in favor of Pioneer in the amount of $55,858,374.28. On January 3, 2001, the Bank timely appealed to this Court, raising the following issues:

1. When funds (proceeds from the sale of notes) are wired to a depositor's unrestricted bank account, is the bank's right to set off the funds against the depositor's uncontested debt to the bank superior to that of a claimant asserting a security interest in the proceeds where: (a) the claimant failed to comply with the requirements for obtaining a valid security interest; (b) the purchaser intended to and did wire the payment in the proper amount to the depositor, who was entitled to receive it; (c) the depositor had been purposefully interposed in the chain of title of the notes; and (d) the claimant failed to comply with Pennsylvania's adverse claims statute?

2. Is a new trial required because the court: (a) failed to instruct the jury that setoff occurs by operation of law and that it takes priority over a security interest; (b) allowed the claimant to portray the bank's exercise of the setoff and subsequent execution of a workout agreement with the depositor as a conspiracy; (c) sanctioned the bank for discovery violations by allowing the claimant to parade the discovery disputes before the jury, while barring the bank's former counsel from testifying about the discovery disputes and the workout agreement; and (d) permitted a wide range of inflammatory statements to be made to the jury?

3. May a claimant recover consequential damages for wrongful setoff by a bank, and, if so, were the plaintiff's damages proximately caused by the setoff and measured in a manner permitted by Pennsylvania law?

4. Is the bank subject to punitive damages even though (a) statutory common law supported its position and (b) it acted on the advice of counsel?

5. Was the $40.5 million remitted punitive award excessive under the Due Process Clause and Pennsylvania law, and did the trial court err in admitting evidence of the net worth of the parent of the bank's merger partner for purposes of determining punitive damages?

Bank's Brief, at 2.

■■■ ¶ 11 Since many of the issues raised by the Bank stem from the denial of post-trial motions seeking judgment notwithstanding the verdict and/or a new trial, we begin by setting forth the governing standards of review.

The decision whether to grant a new trial lies within the trial court's discretion. *Martin v. Evans*, 551 Pa. 496, 501–02, 711 A.2d 458, 461 (1998). Therefore, when reviewing an order denying a motion for a new trial, we must determine whether the trial court "clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case." *Whyte v. Robinson*, 421 Pa.Super. 33, 617 A.2d 380, 382 (1992). "A new trial is warranted when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice." *Martin*, 551 Pa. at

501, 711 A.2d at 461. Conversely, JNOV may be entered if, after considering only the evidence supporting the verdict and giving the verdict winner the benefit of the doubt, the trial court clearly finds that the movant is entitled to judgment as a matter of law, and the evidence presented at trial was such that no two reasonable minds could disagree that the verdict should be in favor of the movant.[5] *Degenhardt v. Dillon Co.*, 543 Pa. 146, 153, 669 A.2d 946, 950 (1996). Finally, we note that credibility determinations are for the jury, which "is entitled to believe all, part, or none of the evidence presented. *Randt v. Abex Corp.*, 448 Pa.Super. 224, 671 A.2d 228, 233 (1996)."

*Brinich v. Jencka*, 757 A.2d 388, 395 (Pa.Super.2000).

■■■ ¶ 12 Some issues raised by Appellant involve challenges to the trial court's conclusions of law. As such our review of these issues is plenary. *See Moorhead v. Crozer Chester Med. Ctr.*, 564 Pa. 156, 765 A.2d 786, 788 (2001); *Phillips v. A– Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995). *See also American Appliance v. E.W. Real Estate Management, Inc.*, 564 Pa. 473, 769 A.2d 444, 446 (2001) (appellate review of questions of law is plenary).

**Sufficiency of the Evidence: Conversion:**

■■■ ¶ 13 "Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without

---

**5.** Put differently, there are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1007 (1992) (citations omitted).

the owner's consent and without lawful justification." *Shonberger v. Oswell,* 365 Pa.Super. 481, 530 A.2d 112, 114 (1987). According to *L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.,* 777 A.2d 1090, 1095–1096 (Pa.Super.2001),

> the classic definition of conversion under Pennsylvania law is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification. Although the exercise of control over the chattel must be intentional, the tort of conversion does not rest on proof of specific intent to commit a wrong. It is fundamental that a good faith purchaser of goods from a converter is also a converter and must answer in damages to the true owner. The general rule for chattels is that "a bona fide purchaser from a thief gets nothing." This is so because a converter has no title to the chattels, and thus can convey nothing to a bona fide purchaser for value.

*Id.* (citations and quotation marks omitted).

¶ 14 It must also be noted that money may be the subject of conversion. *Shonberger v. Oswell, supra,* 530 A.2d at 114. Since Pioneer's complaint alleged that the Bank committed the tort of conversion with respect to the Fund, as a threshold matter, we must determine whether Pioneer established that it had a property right with respect to the Fund at the time of the alleged conversion. It is only after it is determined that one has a property right in a chattel that an inquiry must be made as to whether there has been a deprivation of, or an interference with that right to constitute conversion.

¶ 15 Viewed in the light most favorable to Pioneer, as the verdict winner, there was sufficient evidence to support the jury's determination that Pioneer owned the Fund and that the Bank was liable for conversion. Melanie Hotz (RNG), Glenda Klein (Pioneer), Howard Seidman (AFMC), and Joseph Scheuren (AFMC) all testified that the Fund belonged to Pioneer. In addition to the testimony of the above individuals, the notes which generated the Fund were accompanied by bailee letters which indicated that Pioneer and Bank One owned the notes and the proceeds of the notes. Also, shortly after the Fund was wired to AFMC's account at the Bank, Pioneer and Norwest notified the Bank that the Fund did not belong to AFMC but to Pioneer; and David Moffitt, counsel for AFMC, also notified the Bank in writing that the Fund belonged to Pioneer. Additionally, we note that when the proceeds of the First Portfolio were wired to AFMC's account at the Bank, the Bank was promptly notified that the money did not belong to AFMC but to Pioneer. Without much ado, the Bank permitted the money to be wired to Pioneer's account with Bank One Texas. Given what occurred with the proceeds of the First Portfolio, the testimony of the participants in the transactions, the bailee letters and other documentary evidence, we conclude that sufficient evidence was adduced at trial to support the jury's finding that the Fund belonged to Pioneer.

**Applicability of the Bankruptcy Code:**

¶ 16 The Bank argues that under the Bankruptcy Code, the filing of a bankruptcy petition extinguished all pre-petition grants of security interests as to property acquired post petition. 11 U.S.C. § 552(a). The Bank maintains that since RNG filed its bankruptcy petition in August 1997, and the First and Second Portfolios contained loans made by RNG in October and November 1997 (post-petition loans), these loans cannot be subject to the security interest created by the May 1997

agreement (pre-petition agreement). The Bank's recitation of the general provisions of section 552(a) is correct. This section, however, does not afford Bank any relief. The Bank is correct that under 11 U.S.C. § 364(c), a bankruptcy trustee/debtor-in-possession must receive court approval before obtaining credit or incurring a debt secured by lien. Section 364(c) allows the bankruptcy court, after notice and a hearing, to authorize the incurring of debt and the granting to creditors of either (1) priority over all other administrative expenses, (2) a lien on property of the estate not otherwise subject to a lien, or (3) a junior lien on property of the estate subject to a lien. Pursuant to the above section, in trustee-debtor versus creditor disputes, bankruptcy courts have routinely held that a creditor who purports to extend secured credit to a bankruptcy trustee without court approval is not entitled to priority or super-priority treatment. *See e.g. In re Pizza of Hawaii, Inc.*, 69 B.R. 60 (Bkrtcy.D.Hawai'i 1986) (Creditor did not have priority administrative claim where loan occurred post-petition, and no hearing was held to authorize incurring of debt). However, bankruptcy courts do not **automatically** rescind or strip post-petition "secured" debts (obtained without court approval) of their secured status simply because there was no prior court approval. Some courts have exercised their discretion in deciding the remedy for the failure to obtain court approval. *See e.g. In re McConville*, 110 F.3d 47 (1997), *certiorari denied* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (The appropriate remedy, when Chapter 11 debtors-in-possession unlawfully executed deed post-petition, without first obtaining bankruptcy court approval of their ability to incur secured post-petition debt, was order limiting amount of deed of trust lien and not totally rescinding deed of trust, where loan advanced by deed of trust lenders had enabled debtors to obtain deed of trust property for benefit of estate; however, in light of lenders failure to make any inquiry as to debtors' financial condition prior to making post-petition loan, lenders were entitled to lien in deed of trust property only for unreimbursed portion of funds which they blindly advanced, with no benefit from loan).

¶ 17 In the case at bar, RNG's failure to obtain bankruptcy court approval before obtaining a secured loan from Pioneer did not **automatically** strip the loan of its secured status. However, the bankruptcy court, upon petition by a party with standing to do so, could rescind the transaction and/or strip the loan of its secured status. In the case of RNG, there has been no petition to the bankruptcy court to strip the loan of its secured status, and the bankruptcy court has not ruled that the loan must lose its secured status because of RNG's failure to obtain court approval before obtaining the loan from Pioneer. Therefore, we cannot agree with the Bank that Pioneer's loan to RNG was a general, unsecured loan and that Pioneer was nothing more than a general, unsecured creditor of RNG. Consequently, Pioneer had at least, a security interest in the Fund. Thus, the Bankruptcy Code affords Bank no relief. Parenthetically, we question the Bank's standing to raise issues related to RNG's bankruptcy case: the Bank was not a creditor to RNG; the Bank was not involved in a transaction with RNG either pre- or post-petition; and the Bank was not otherwise involved in the bankruptcy proceedings. As Pioneer correctly pointed out, no court has ever invalidated a creditor's security interest when the complaining party was not a party to the bankruptcy case, was not otherwise involved in the bankruptcy proceeding and has not petitioned the bankruptcy court to invalidate the security interest at issue. In essence,

the Bank invites us to be the first court to invalidate a security interest in a loan obtained without bankruptcy court approval even though the complainant was not involved in the bankruptcy proceeding and has not petitioned the bankruptcy court to invalidate the security interest. We politely decline this invitation.[6]

### Applicability of Section 4A502 of the UCC:

¶ 18 The Bank argues that even if Pioneer had a valid security interest in the Fund, the Bank is entitled to judgment pursuant to 13 Pa.C.S.A. § 4A502(c). Section 4A502(c) provides that:

> **(c) Payment orders issued to beneficiary's bank.**—If a beneficiary's bank has received a payment order for payment to the beneficiary's account in the bank, the following rules apply:

> (1) The bank may credit the beneficiary's account. The amount credited may be set off against an obligation owed by the beneficiary to the bank or may be applied to satisfy creditor process served on the bank with respect to the account.

> (2) The bank may credit the beneficiary's account and allow withdrawal of the amount credited unless creditor process with respect to the account is served at a time and in a manner affording the bank a reasonable opportunity to act to prevent withdrawal.

> (3) If creditor process with respect to the beneficiary's account has been served and the bank has had a reasonable opportunity to act on it, the bank may not reject the payment order except for a reason unrelated to the service of process.

¶ 19 The Bank argues that pursuant to section 4A502(c)(1), when the Fund was wired to AFMC's account, the Bank automatically effectuated a setoff of that amount and applied it to AFMC's debt to the Bank. According to the Bank, the setoff occurred automatically and not on December 18, 1997 as the trial court opined.

■ ¶ 20 We agree with the Bank that pursuant to *Royal Bank of Pennsylvania v. Selig*, 434 Pa.Super. 537, 644 A.2d 741 (1994), it had an automatic right of setoff and need not take any affirmative steps to effectuate this right. "Set-off, however, is appropriate only where certain conditions are met. There must be mutuality of obligation between the bank and the depositor; the funds against which set-off is exercised must belong to the depositor; the funds must be deposited with the bank into a general account; and, the debt owed by the depositor to the bank must be mature." *Id.* at 744 (citations omitted).

■ ¶ 21 In the instant case, it is undisputed that the debt owed by AFMC (the depositor) to the Bank was mature at the time the Fund was wired into AFMC's account and that there was a mutuality of obligation between the Bank and AFMC. Further, the jury determined that AFMC's account with the Bank was a general account. Thus, it would appear that the Bank has met most of the conditions for exercising its right of automatic setoff. However, a critical element of the right to

---

**6.** Although the trial court incorrectly suggested that Pioneer's secured loan to RNG was made in the ordinary course of business, and, therefore, needed no bankruptcy court approval, we affirm, albeit on different grounds, the trial court's conclusion that the Bankruptcy Code does not mandate the invalidation of Pioneer's security interest despite the absence of bankruptcy court approval. *See Lobianco v. Property Protection, Inc.*, 292 Pa.Super. 346, 437 A.2d 417, 424 (1981) (an appellate court may affirm the decision of the trial if it is correct on any grounds).

automatic setoff is that the funds against which setoff is exercised must belong to the depositor. On this issue, the jury unequivocally found that Pioneer had an ownership interest in the Fund wired to AFMC's account with the Bank. Since the jury determined that the Fund belonged to Pioneer and not to AFMC, the Bank could not exercise its right of automatic setoff against the Fund.

¶ 22 The Bank strenuously argues that the UCC, specifically, 13 Pa.C.S.A. § 4A502 de-emphasizes ownership, eliminating the requirement that the funds against which setoff is exercised must belong to the depositor. We disagree. Nothing in the language of section 4A502 or in Pennsylvania case law indicates or mandates that a Bank should not determine whether the funds belong to a depositor before setoff is exercised. Indeed, if the ownership requirement were eliminated, it would lead to the absurd consequence whereby a Bank could effectuate an automatic setoff even when funds are mistakenly or inadvertently wired or deposited to the wrong account. We are therefore not persuaded by the Bank's argument that the issue of the ownership of the Fund is irrelevant under 13 Pa.C.S.A. § 4A502

¶ 23 Interestingly, in another section of its brief, (Bank's Brief, at 24), the Bank argues that the evidence established that AFMC owned the Fund and that as a result, the Bank met all the requirements for an automatic setoff. We must point out that this argument which emphasizes AFMC's alleged ownership of the Fund is inconsistent with the Bank's argument (bank's Brief, at 20–21) that ownership of the Fund is irrelevant under the UCC. As we previously pointed out, the jury found, based on ample evidence, that Pioneer owned the Fund. Therefore, the Bank's assertion that AFMC owned the Fund must fail.

¶ 24 The next argument advanced by the Bank is that the trial court committed an error of law in its jury instructions. The Bank cited the following portion of the jury instruction:

> Now, a bank has a right under the law to freeze an account, a debit account, for purposes of collecting a debt from the depositor under limited circumstances. One the debt must be mature. Well under the circumstances of this case the debt was mature. AFMC owed the money to CoreStates for the overdrafts.
>
> The other condition is that the money must belong to AFMC. So it must be known that CoreStates is able to seize. That's a jury issue that you're going to answer: Was it AFMC's money, or was there a security interest in plaintiff, in this case Pioneer Commercial Funding?
>
> \* \* \*
>
> You have to decide \*\*\* if, one, that these funds belonged to Pioneer as a secured creditor, which is a superior right than an unsecured creditor, as I discussed with you. You have to make that decision. And in Question Number One, that says: Do you find that the plaintiff had this ownership interest about which I discussed with you which would have entitled them to the funds[?] the answer would be yes or no.

Bank's Brief, at 30–31.

¶ 25 The Bank interpreted the above instructions to mean that "if Pioneer was a secured creditor, CoreStates [the Bank] had an obligation to release the Fund." *Id.* at 32.

> When examining jury instructions, our scope of review is to determine whether the trial court committed clear abuse of discretion or error of law controlling the outcome of the case. Error in a charge

is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error. When reviewing a charge to the jury, we will not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety.

*Bannar v. Miller,* 701 A.2d 232, 240 (Pa.Super.1997) (citations and quotation marks omitted).

¶ 26 Reviewing the Bank's argument in light of the above standards, we find the trial court did not commit an error of law. After reviewing the trial court's jury instructions in their entirety, we find that the trial court properly instructed the jury that it is their responsibility to determine whether Pioneer had an ownership interest in the Fund and that it is only if it is determined that Pioneer had a property interest in the Fund that Pioneer can maintain an action for conversion. We refuse to isolate certain phrases and passages from the trial court's jury instruction and interpret them out of context as the Bank does in its argument. Further the Bank suggests that the following instruction may have palpably misled the jury: "A jury issue you're going to answer [is]: Was it AFMC's money, or was there a security interest in plaintiff, in this case Pioneer Commercial Funding?" The jury was not misled by the above instruction and did not confuse any interests which AFMC may have had in the Fund with Pioneer's interest. The jury's understanding was clearly shown in its affirmative answer to following question: "Do you find that plaintiff Pioneer Commercial Funding

Corporation had an ownership interest in the funds wired by Norwest to American Financial Mortgage Corporation's settlement account at defendant CoreStates Bank that entitled plaintiff to possession of the funds?" Accordingly, we find no defect in the jury instructions sufficient to warrant a new trial.

**Applicability of the Banking Code:**

■■■■ ¶ 27 Another issue raised by the Bank relates to the applicability of the Pennsylvania Adverse Claims Statute (Section 606 of the Banking Code of 1965, 7 P.S. § 606). The Bank maintains that it is entitled to a directed verdict because it had a statutory defense to Pioneer's conversion claim, namely, Pioneer's failure to assert a claim to the Fund pursuant to the adverse claims statute. Relying on Section 606(b), the Bank argues that Pioneer, as the party seeking to make an adverse claim, was required to either obtain a declaratory judgment in support of its right of ownership or post a bond. According to the Bank, because Pioneer failed to meet these two requirements, Pioneer's conversion must fail. After reviewing the record and the applicable law, we must disagree with the Bank's position. As Pioneer correctly points out, the Pennsylvania Adverse Claims Statute applies to claims by a third party adverse to the claim of a depositor. The comment to Section 606 indicates that the purpose of the statute is to limit the involvement of banks in disputes between depositors and third parties. In the case at bar, Pioneer's claim to the Fund is not adverse to that of the depositor, AFMC. Indeed, at the outset, AFMC unequivocally disclaimed any interest in the Fund, and told the Bank that the Fund belonged to Pioneer. Thus, the issues involved in this case do not implicate the adverse claims statute.

¶ 28 Both Pioneer and the Bank cite to different parts of our Court's decision in *E.F. Houghton & Co. v. Doe*, 427 Pa.Super. 303, 628 A.2d 1172 (1993) in support of their respective positions regarding the applicability of Section 606 of the Banking Code. In *Houghton*, we addressed the issue of the nature of the notice that must be given to a bank by a third party under Section 606 of the Banking Code in order for the third party to assert successfully a claim to funds in a depositor's account superior to that of the depositor or the bank itself. The relevant facts of *Houghton* are as follows: An employee of E.F. Houghton & Company (Houghton) stole about $1,000,000 from Houghton and deposited the money into two accounts at Mellon Bank. The two accounts were in the name of the Houghton employee, Bruno, and his wife. Using the $1,000,000 as collateral, Mellon Bank approved a $150,000 loan to Bruno and his wife. One of the terms of the loan agreement was that in the event of default, Mellon Bank was entitled to withdraw $150,000 plus accrued interest from the Brunos' accounts to pay the debt. Houghton later discovered Bruno's theft and subsequently obtained judgment against the Brunos. Houghton then notified Mellon Bank in writing regarding the theft. Houghton also requested Mellon Bank to freeze the funds in the accounts. Upon Mellon Bank's refusal to freeze the account without a court order, Houghton then obtained a writ of attachment. Before receiving the writ of attachment, Mellon Bank, withdrew from one of the Brunos' accounts the sum of $151,481.88 representing the principal

and interest on its loan to the Brunos, the Brunos having defaulted on their payments. On appeal, Houghton relied on *Sherts v. Fulton Nat'l Bank*, 342 Pa. 337, 21 A.2d 18 (1941) [7] and argued that Mellon Bank's setoff prior to service of the writ of attachment was an illegal conversion. Houghton argued that "if a bank has knowledge, or notice of facts enough to put it upon inquiry, that the funds in a depositor's account actually belong to a third person, it may not apply such funds to a debt owed to it by the depositor individually." *Id.* at 1175, citing *Sherts*.

¶ 29 In rejecting Houghton's argument our Court distinguished *Houghton* from *Sherts*, noting that "Sherts had not attempted to mislead the bank as to the true ownership of the funds, and that the bank therefore could not avoid treating it as money held in trust for Sherts' client. The claims asserted by Sherts' clients against the bank were not "adverse" to Sherts himself, as he never pretended that the money was his own." *Id.* at 1175. We also noted that in *Houghton*, unlike *Sherts*, Mellon Bank relied on the representations of the depositors who affirmatively misled the bank into believing that certain stolen funds actually belonged to them. *Id.* at 1176. Also, unlike *Sherts*, the *Houghton* appeal did not involve deposit funds held for the benefit of a third party, in a trust, fiduciary or agency context. *Id.* at 1175–1176.

¶ 30 Based on our careful review of *Houghton*, we agree with Pioneer that *Houghton* is distinguishable from the instant case. In *Houghton*, the Brunos claimed an interest in the funds. Hough-

**7.** In *Sherts*, the depositor, Sherts, who is an attorney, maintained a checking account in the bank in his individual name and subsequently, added the word "attorney" to the name in the passbook and on the bank's ledger sheets. Thereafter, he placed only collections made for clients in the account, and

signed all checks as "attorney." He also maintained another account in the name "H. Edgar Sherts, Farm Account," in which he held funds for a decedent's estate. The bank later applied the balances in both accounts toward the payment of an overdue note owed by Sherts personally to the bank.

ton's claim to the funds was therefore adverse to the Brunos' interest. In the instant case, however, Pioneer's claim to the Fund is not adverse to the depositor, AFMC. Shortly after the wire transfer, AFMC promptly disclaimed any interest in the Fund and notified the Bank that the Fund belonged to Pioneer. Also, when the above facts are considered in conjunction with the bailee letters, which accompanied the notes in this case, it is clear that the notes and the proceeds of the notes were being held in trust or for the benefit of Pioneer and Bank One. The Funds never belonged to AFMC. Thus, similar to *Sherts*, the Fund in this case was deposited into AFMC's account for the benefit of a third party, and the owner of the account, AFMC disclaimed any interest in the Fund. Based on the foregoing analysis, we hold that the Bank is not entitled to relief pursuant to Section 606 of the Banking Code.

**The Trial Judge's Conduct at the Trial:**

■■■ ¶ 31 *Allegations of conspiracy.* The Bank argues that the trial court improperly permitted Pioneer to make inflammatory allegations that the Bank was guilty of conspiracy and cover-up, based on the Workout Agreement between the Bank and AFMC, even though the complaint never set forth a claim for conspiracy. We agree with the Bank that the trial court erroneously permitted Pioneer to make allegations of conspiracy and cover-up during the trial. However, this error is harmless with respect to the liability verdict because the jury did not find the Bank liable for conspiracy and the verdict slip did not contain the conspiracy charge and the jury did not return a verdict on the issue of conspiracy. The jury re-

turned a verdict on the issue of conversion. *See Bannar v. Miller*, 701 A.2d 232, 241–242 (Pa.Super.1997) (where the trial court erroneously charged the jury on civil conspiracy even though plaintiff had withdrawn the conspiracy count of the complaint, the error was harmless because conspiracy was not reflected on the verdict slip, and the jury was incapable of returning a verdict on that count). In the instant case, with respect to the liability, the trial court's error was less egregious because the trial court, unlike in *Bannar*, did not instruct the jury on the issue of conspiracy. Thus, any error which the trial court may have committed in permitting allegations of conspiracy and cover-up is harmless with respect the finding of liability.[8] Apart from these allegations of conspiracy and cover-up, sufficient evidence was adduced to support the jury's verdict on the issue of conversion.

¶ 32 *Discovery Sanctions:* The Bank's next arguments concern the trial court's imposition of discovery sanctions. It is the Bank's position that the trial court abused its discretion when, as a discovery sanction against the Bank, it precluded Attorney Walter Weir, the Bank's former counsel from testifying. The Bank also takes a similar position with respect to the trial court's discovery sanction, which permitted Pioneer to present to the jury evidence of the litigation conduct and discovery violations of the Bank's lawyers.[9]

■■■ ¶ 33 "The decision whether to sanction a party for a discovery violation and the severity of such a sanction are matters vested in the sound discretion of the trial court. We will not reverse a trial

---

8. The issue of whether these allegations affected the jury's award of damages will be revisited later.

9. The evidence of the litigation conduct and discovery violations was also permitted for another purpose: to show outrageous conduct (for the award of punitive damages) by the Bank.

court's order imposing such a sanction unless the trial court abused its discretion." *Luszczynski v. Bradley,* 729 A.2d 83, 87 (Pa.Super.1999) (citations omitted). Under Rule 4019 of the Pennsylvania Rules of Civil Procedure, a trial court may impose sanctions for discovery violations. The factors for trial courts to consider when determining an appropriate sanction under Rule 4019 are as follows: (1) the nature and severity of the discovery violation; (2) the defaulting party's willfulness or bad faith; (3) prejudice to the opposing party; (4) the ability to cure the prejudice; and (5) the importance of the precluded evidence in light of the failure to comply. *Id.* at 87 (citations omitted).

¶ 34 After a thorough review of the record and of the trial court's rationale for the sanctions in light of the above factors, we cannot conclude that the trial court abused its discretion. The Bank's discovery violations were willful, repeated and persistent. The violations included the withholding of critical documents, failure to comply with requests for documents despite the entry of numerous discovery orders, production of critical documents on the eve of trial and in the middle of trial, etc. As a result of these violations, Pioneer suffered prejudice, including, but not limited to, financial costs. The trial court's sanction—allowing the jury to hear evidence of the discovery violations—appears novel.[10] However, it is not the most severe sanction: the most severe sanction would have been the entry of a default judgment against the Bank. We express no opinion as to the appropriateness of a default judgment given the nature and magnitude of the Bank's violations. The sanction imposed by the trial court was proper

under the circumstances, and we find no abuse of discretion.

¶ 35 Our review of another discovery sanction imposed by the trial court—the preclusion of the testimony of Attorney Weir during the Bank's case-in-chief—shows that the trial court did not abuse its discretion. Attorney Weir as an agent for the Bank, was part and parcel of the discovery violations at issue in this case. Therefore, the preclusion of his testimony for discovery violations is an appropriate sanction. Besides, the severity of the preclusion of Attorney Weir's testimony is tempered by the fact that Attorney Weir testified as on cross-examination during Pioneer's case-in-chief. The Bank also elicited testimony from Attorney Weir following Pioneer's cross-examination. In essence, the trial court did not completely preclude Attorney Weir's testimony. *See* Trial Court Opinion, 12/4/2000, at 18 n. 6. Viewed in light of the five factors delineated in *Luszczynski, supra,* we cannot conclude that the trial court abused its discretion in partially precluding Attorney Weir's testimony.

¶ 36 *The Conduct of Pioneer's Trial Counsel:* The Bank contends in its next argument that the trial court improperly permitted Pioneer's trial counsel to inflame the jury and to appeal to the jury's passion and prejudice. The Bank cites to an instance when Pioneer's counsel asked a witness if his testimony was motivated by the possibility that the jury would return a verdict in the hundreds of millions. R.R. 2704a. The above question was improper, and the trial court gave prompt curative instructions (R2704a –2705a;

---

**10.** Under certain circumstances, Pennsylvania courts have permitted jury instructions regarding a party's discovery violations such as the destruction and withholding of documents. This is the so-called adverse inference instruction. *See* Pennsylvania Suggested Standard Jury Instructions (Civil) 5.06; *McHugh v. McHugh,* 186 Pa. 197, 40 A. 410, 411 (1898); *Paves v. Corson,* 765 A.2d 1128 (Pa.Super.2000).

2708a – 2717a). However, we find that these instructions did not adequately remedy the situation. *See Siegal v. Stefanyszyn*, 718 A.2d 1274, 1277 (Pa.Super.1998). It is not a stretch to conclude that this reference to a verdict in the hundreds of millions played a part in jury's subsequent award of $337 million in punitive damages.

¶ 37 The Bank also points to several instances of inflammatory language used by Pioneer's counsel during closing arguments. We agree with the Bank that counsel's improper inflammatory remarks played a significant role in the jury's award of punitive damages. We will discuss this issue further in our review of the award of punitive damages.

**Damages:**

■■■■■ ¶ 38 *Consequential damages:* On the issue of consequential damages,[11] the Bank argues that the award should be vacated because "(i) consequential damages are not available for a claim of wrongful setoff against a bank; (ii) Pioneer did not meet its burden of proving that the alleged conversion caused its demise; (iii) Pioneer failed to make any effort to mitigate its damages; and (iv) the amount of consequential damages is unsustainable as a matter of law." Bank's Brief, at 47.

■■■■■ ¶ 39 The Bank's argument that consequential damages are not available for a claim of wrongful setoff against a bank is without merit. The jury found the Bank liable for the tort of conversion and the consequential damages were awarded as a result of the Bank's liability for conversion. Pennsylvania law is clear that the measure of damages for conversion is the market value of the converted property at the time and place of conversion. *Bank of Landisburg v. Burruss*, 362 Pa.Super. 317,

524 A.2d 896, 902 (1987). Pennsylvania law also provides that in tort actions in which business losses and/or lost profits are alleged to have indirectly resulted from the misconduct, consequential damages are recoverable. *See Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983). In the case at bar, the jury determined, based on ample evidence, that the business losses suffered by Pioneer resulted from the Bank's conversion of the Fund. Therefore, we hold that the award of consequential damages was proper.

¶ 40 The Bank's argument that Pioneer failed to prove that the alleged conversion caused its demise is meritless. Pioneer presented evidence at trial that as a result of the Bank's seizure of the Fund, Pioneer was unable to obtain a $200 million line of credit from Nikko Financial Services; that RNG was forced out of business and $4.5 million of additional RNG loans became stale. Also, as a result of the Bank's seizure of the Fund, Bank One cut off its line of credit to Pioneer and Pioneer was unable to obtain an alternative source of credit. The above evidence amply supports Pioneer's claim, and the jury's determination that Pioneer was entitled to consequential damages.

¶ 41 The evidence also showed that Pioneer attempted to mitigate its losses. As Pioneer correctly points out, Boaz Harel testified that Leedan Business Enterprise, Pioneer's principal shareholder, invested several million dollars in an effort to keep Pioneer afloat after the Bank's seizure of the Fund. Pioneer's Brief, at 41.

■■■■■ ¶ 42 *The measure of damages:* The Bank maintains that the measure of consequential damages was unduly specu-

---

11. Consequential damages are "losses that do not flow directly and immediately from an injurious act, but that result indirectly from the act." Black's Law Dictionary (7th Ed.) at 394.

lative. Boaz Harel testified that the drop in Pioneer's market capitalization from November 26, 1997 to the date of his trial testimony was $13.6 million. This evidence was ostensibly the basis of the jury's award of $13.5 million. The Bank now argues that because market capitalization is not an appropriate or reliable measure of the value of a closely-held, thinly-traded company and because Pioneer did not establish that the decline in market capitalization was wholly attributable to the Bank's seizure of the Fund, the amount of the consequential damages was speculative. We agree with the Bank that in some instances, market capitalization alone cannot be used to determine the value of a corporation. In the instant case, as the Bank noted, the trial testimony showed that Pioneer's stock was traded over the counter and that one investor owned a controlling share of its securities. As such, the stock prices wildly fluctuated periodically. Although the stock price of a thinly traded company may be helpful in determining the company's value, it should not be the only factor in that determination. Other factors such as (1) net asset value; (2) actual market value; and (3) investment value should also be considered. *See In re Glosser Bros., Inc.,* 382 Pa.Super. 177, 555 A.2d 129, 133 (1989). In *In re Glosser Bros,* our Court also noted that in dealing with "closely-held family corporations having unlisted stocks and therefore, no public market, shares are sold too infrequently for market value to play any part in these proceedings." *Id.* at 135, citing *O'Connor Appeal,* 452 Pa.

287, 304 A.2d 694 (1973). Our decision in *In re Glosser Bros* recognized that while the market value is to be totally disregarded only in very limited circumstances, other factors and methods of valuation should be considered as well.

¶ 43 Despite our agreement with the Bank's general statement regarding the use of market capitalization as a valuation method, our review of the record shows that during the damages phase of the trial, the Bank did indeed present alternative methods of valuation which were ultimately rejected by the jury. The Bank also presented the testimony of an expert witness who opined that the Bank's seizure of the Fund did not have a significant impact on the ability of Pioneer to operate beyond 1998. R.R. 2758a. Thus, we are not presented with a situation where the Bank was precluded from presenting alternative methods of valuation. The Bank's valuation methods and expert opinion were simply rejected by the jury while the valuation method presented by Pioneer (market capitalization) was accepted by the jury. Similarly, the Bank's argument that the drop in Pioneer's capitalization was not wholly attributable to the Bank was considered and rejected by the jury. As such, we find no reason to overturn the jury's award of consequential damages.

¶ 44 *Punitive Damages.* Throughout its brief, the Bank repeatedly maintains that Pioneer's counsel was permitted to make inflammatory arguments and allegations that ultimately resulted in a verdict based on passion and prejudice.[12]

---

12. Counsel for Pioneer in his closing arguments suggested that the Bank committed crimes, repeatedly called the Bank's witnesses "liars," compared the Bank to a "thug" and a "gangster" that would "knowingly steal to allow a customer to engage in kiting, to milk it for fees, and then the last second . . . shut it down and just say I'm going to take anybody's money I can." R.R. 2328a–2329a.

In addition, Pioneer's counsel baited the jury by implying that CoreStates was a Goliath and Pioneer a philanthropic David, asking: "How could you not care about the people at RNG? How could you not care at all about all of those families?" and stating without foundation: "[W]e had the government loans, the first time home buyers, the veter-

We agree with the Bank only with respect to the jury's award of punitive damages. Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant, when it shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. *Haines v. Raven Arms*, 536 Pa. 452, 640 A.2d 367, 369 (1994). A jury is given wide latitude to fashion a verdict on damages. *Neison v. Hines*, 539 Pa. 516, 653 A.2d 634 (1995). The large size of a verdict by itself is not evidence of excessiveness. *Layman v. Doernte*, 405 Pa. 355, 175 A.2d 530 (1961).

The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant. *Kirkbride v. Lisbon Contractors*, Inc., 521 Pa. 97, 102, 555 A.2d 800, 803 (1989) (citing Restatement (Second) of Torts § 908(2)). *Accord Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 740–41 (3d Cir.1991), cert. denied, 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992) (applying Pennsylvania law). It is for the jury to weigh these factors in arriving at an appropriate punitive damage award. *Kirkbride v. Lisbon Contractors, Inc., supra,* 521 Pa. 97, 555 A.2d 800. The excessiveness of punitive damages in a case in which they are allowable may be grounds for reversal, for a new trial, or for a remittitur under the usual rules by which the courts control the jury's award of compensatory damages. *See* Restatement of Torts

---

ans. Those are the people that we lent our money to. They don't have one shred of remorse, one bit of humanity about just how many lives got turned upside down." R. 2849a. Counsel claimed that one witness had fabricated his testimony because by the time of trial he had been hired by First Union (R. 2833a) and that C.B. Cook and Walter Weir were not "people dealing with integrity" and "were caught conspiring and stealing money." For other examples, *see* R. 2837a–2838a, R. 2298a ("this deal that was working until CoreStates came in and decided to steal money"), R. 2300a ("corrupt practice, practices in racketeering, mail fraud, bank fraud, a whole host of both civil and criminal acts which they were allowing and milking for fees. We'll get to the fees that Mr. Weir milked it for as well"), R. 2308a ("the seven court orders I got *** [are] part of the let's stone wall them to death, let's hide what we've been doing *** because what they did is despicable. What they did is unethical. It was outrageous. And, they were hiding among every front they could. And, they got a lot to hide about"), R. 2322a–2323a ("They put on Walter Weir. How many lies did we catch him in? *** Those are boldface lies, and he knows it. But then again, they're running for cover"), R. 2326a ("There is no limit to how despicable and outrageous their behavior is. They'll go to any lengths, be- cause what they did in allowing this kite, in milking it for fees, both the bank and then the lawyer"), R. 2329a ("What they did was vicious, and they knew it. And to cover it up and to lie about it, and to behave the way they have, I don't know if it's criminal, but I know it's outrageous"), R. 2337a–2338a ("They let a check kiting scheme go on at CoreStates for all of 1997"), R. 2341a ("think about why it's so despicable, that not only did a bank do something that it knew was a violation of federal law and permit its customer to engage in conduct which it calls criminal, but when it steals Pioneer's money to get it back"), R. 2834a (reference to witness: "The guy was lying *** He was lying to protect his new employer, because they know they've got live risk"), R. 2835a ("Their own customer, the crook who had every reason in the world to say it's my money because it's going to pay down his debt"), R. 2842a ("it's more of this approach that they have to litigation and drag it all out and trial by ambush"), R. 2848a–2849a ("this is a vicious greed machine, drag it out as long as they possibly can. No heart"), R. 2852a ("what they did was diabolical ... that kind of vicious little agenda"), R. 2858a ("When does a bank steal? Steal. That's what they did. That's what conversion is"), R. 2867a–2868a ("as I've told you: They don't have personal integrity").
Bank's Brief, at 45 n. 19.

(Second) § 908, comment d (function of jury). However, a trial judge may not declare a punitive damages verdict to be excessive simply because he or she might have awarded a lesser amount. *Sulecki v. Southeast National Bank,* 358 Pa.Super. 132, 138, 516 A.2d 1217, 1220 (1986) (en banc).

*Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890 (1995). An appellate court can, upon proper basis and reason find that the trial court has abused its discretion in either upholding or remitting damages. *Id.* 929–930. According to the United States Supreme Court, judicial review of the size of punitive damage awards provides a safeguard against excessive verdicts. *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 2335, 129 L.Ed.2d 336, 343 (1994). In *Honda,* the Supreme Court explicitly declined to adopt or identify any particular standard of review which provides the level of scrutiny demanded by the Fourteenth Amendment. *Id.,* 512 U.S. 415, at 114 S.Ct. at 2341 n. 10, 129 L.Ed.2d at 350 n. 10. However, the Supreme Court indicated that the award cannot be the result of "passion and prejudice;" the awards should not be "grossly excessive;" or "against the weight of the evidence." *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 576–77 (1979). In the case at bar, the improper remarks, allegations and innuendo by Pioneer's counsel warranted the grant of a new trial on the issue of punitive damages. The jury's punitive damage award was the result of passion and prejudice. The trial court even realized, albeit in hindsight, that these inflammatory allegations and accusations by Pioneer's counsel necessarily influenced the jury's award of an astronomical $337 million in punitive damages in a case involving a dispute of about $1.8 million. Consequently, the trial court granted the bank's request for a remittitur, reducing the punitive damages award to $40.5 million. However, we find that this remitted amount still bears no reasonable relationship to the wrongful conduct.[13] Counsel cannot make arguments prejudicial to the opposing party which are not supported by facts in evidence, or which are inflammatory or beyond the limits of fair or sound argument, unduly influencing or distracting the jury. *See, e.g., Girard Trust Corn Exchange Bank v. Philadelphia Transp. Co.,* 410 Pa. 530, 190 A.2d 293 (1963); *Piwoz v. Iannacone,* 406 Pa. 588, 178 A.2d 707 (1962); *Millen v. Miller,* 224 Pa.Super. 569, 308 A.2d 115 (1973).

¶ 45 The Bank has carefully listed the instances in which Pioneer's counsel made allegations of criminal conduct, alleged cover-up, and made other inflammatory statements. *See* footnote 10. We find these instances too numerous to be harmless and we find these allegations to be unduly prejudicial. Further, we find that the trial court's grant of a remittitur in the amount of $40.5 million did not adequately remedy the harm caused. Accordingly, we will vacate the award of punitive damages and remand this matter for a new trial on the issue of punitive damages alone. We recognize that it is the province of the jury to assess punitive damages. However, the award of damages cannot be the result of caprice, prejudice, partiality, corruption or some other improper influence. *See Gradel v. Inouye,* 491 Pa. 534, 421 A.2d 674 (1980).

*Due Process:*

¶ 46 Another basis for our decision to vacate the award of punitive dam-

---

**13.** An appellate court can, upon proper basis and reason find that the trial court has abused its discretion in either upholding or remitting damages. *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890, 929–930 (1995).

ages is the Due Process Clause of the Fourteenth Amendment. A decision to punish a tortfeasor by exacting punitive damages is an exercise of State power which must comply with the Due Process Clause of the Fourteenth Amendment. *Honda,* 114 S.Ct. at 2335, 114 S.Ct. 2331, 129 L.Ed.2d at 342–43. Because punitive damages pose an acute danger of arbitrary deprivation of property, due process requires judicial review of the size of punitive damage awards. *Id.,* 512 U.S. 415, 114 S.Ct. at 2340–41, 129 L.Ed.2d at 349–50.

¶ 47 The Due Process Clause of the Fourteenth Amendment protects a tortfeasor from the imposition of a "grossly excessive" punitive damages award. *BMW of North America Inc. v. Gore,* 517 U.S. 559, 560–61, 116 S.Ct. 1589, 1592, 134 L.Ed.2d 809, 818 (1996). The size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion. *Id.* at 567–68, 116 S.Ct. at 1595, 134 L.Ed.2d at 822. Under the U.S. Supreme Court jurisprudence, the following must guide a court's review of the propriety of a punitive damages award: the degree of reprehensibility of the defendant's conduct, the ratio of punitive damages to the actual or potential harm inherent in that conduct, and the existing civil and criminal penalties for similar conduct. *Id.* at 573–82, 116 S.Ct. at 1598–1603, 134 L.Ed.2d at 826–33.

¶ 48 The degree of reprehensibility is the primary indicator of the reasonableness of a punitive damages award. *Id.* at 575–77, 116 S.Ct. at 1599, 134 L.Ed.2d at 826. The reprehensibility inquiry takes into consideration the fact that some wrongs are more blameworthy than others. *Id. See Shiner v. Moriarty,* 706 A.2d 1228, 1241 (Pa.Super.1998). With re-

gard to the Bank's argument regarding the proportionality of the punitive damages to the compensatory damages, we note that under Pennsylvania law, punitive damages need bear no proportional relationship to the compensatory damages awarded in a particular case. Rather, a reasonable relationship must exist between the amount of the punitive damage award and the twin goals of punishment and deterrence, the character of the tortuous act, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant. Mathematical proportionality is not required between punitive and compensatory damages. Although there are no mathematical formulae or hard and fast rules about the relationship between the tortuous conduct and the amount of punitive damages, our review of the record shows that the punitive damage award of $337 million (remitted to $40.5 million) bears no reasonable relationship to the Bank's conversion of the Fund. The unreasonableness and gross excessiveness of the jury's award is buttressed by the fact that $337 million is the highest punitive damage award in Pennsylvania history. It is inconceivable that the Bank's conduct in this case was the most reprehensible and the most blameworthy conduct in Pennsylvania history. Furthermore, we reiterate that the remittitur of $40.5 million is still excessive and does not bear any reasonable relationship to the Bank's wrongful conduct. Therefore, this unreasonable punitive damage award cannot stand. Due to our resolution of the punitive damages issue, we need not address other aspects of the Bank's argument on this issue.

¶ 49 In conclusion, based on the foregoing discussion, we find that the amount of punitive damages in this case is grossly excessive and shocks our sense of justice. *See Lewis v. Pruitt,* 337 Pa.Super. 419, 487 A.2d 16, 22 (1985) (this Court will not find

a verdict excessive unless it is so grossly excessive as to shock our sense of justice). Based on the foregoing discussion, we affirm the judgment of the trial court with respect to liability, compensatory damages, and consequential damages. We vacate the award of punitive damages in the amount of $40.5 million, and remand for a new trial solely on the issue of punitive damages.

¶ 50 Affirmed in part and reversed in part. Remanded for a new trial with respect to punitive damages. Jurisdiction relinquished.

BECK, J. files Dissenting Opinion.

## DISSENTING OPINION BY BECK, J.

¶ 1 I respectfully dissent from the majority's decision to affirm the judgment with regard to liability for conversion. I believe the common law cause of action of conversion is inapplicable. This case is controlled by Article 4A of the Uniform Commercial Code, which governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers. The AFMC Funds Transfers at issue were clearly governed by Article 4A, which authorized CoreStates's conduct in accepting and setting off the Funds Transfer. Contrary to the majority's conclusion, I believe that CoreStates acted within its rights under Article 4A–502 because I agree with CoreStates that ultimate ownership of the funds is not relevant under Article 4A. Moreover, common law principles of ownership that vary from state to state are ill-suited for the national regulation of financial institutions.

¶ 2 The position that the U.C.C. controls this case is supported by the Official Comment to Section 4A–102 which states that

[b]efore this Article was drafted there was no comprehensive body of law— statutory or judicial—that defined the judicial nature of a funds transfer or the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not uniform. Judges have had to resolve disputes by referring to general principles of common law or equity ... but attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory ... The rules that emerge represent a careful and delicate balancing of interests and are intended to be the exclusive means of determining the rights, duties, and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in the Article.

U.C.C. § 4A–102, Official Comment.

¶ 3 Furthermore, many courts have found that common law claims, such as conversion, are precluded when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4A. *See, e.g. Grain Traders, Inc. v. Citibank,* 160 F.3d 97 (2d Cir.1998) (finding that plaintiff's claim for conversion was precluded under state's commercial code as inconsistent with commercial code); *Banco de la Provincia de Buenos Aires v. BayBank Boston N.A.,* 985 F.Supp. 364 (S.D.N.Y.1997) (stating that for conversion claim to stand it cannot be inconsistent with Article 4A); *Cumis Ins. Soc., Inc. v. Citibank, N.A.,* (921 F.Supp. 1100) (S.D.N.Y.1996) (finding claim for conversion failed because bank's actions were expressly authorized by Article 4A).

¶ 4 There are sound policy reasons underlying the conclusion that Article 4A pre-empts inconsistent provisions of state law. Having a uniform method of transferring funds provides a national set of rules and regulations giving the system discipline, stability, predictability, efficiency, liquidity and finality. The integrity of this complex system will be compromised if state actions inconsistent with Article 4A are permitted against participating institutions. If the U.C.C. has established an imperfect vehicle for the transfer of funds then the proper course is to amend the U.C.C. rather than impair the effectiveness of the system by injecting inconsistent common law tort actions.