524 A.2d 896

**The BANK OF LANDISBURG and Alfred Albright**

**v.**

**Curtis W. BURRUSS, Carol E. Burruss, Shady Lane Dairy Sales, Inc., and Glen D. Fite, Appellants.**

Superior Court of Pennsylvania.

Submitted June 25, 1986.

Filed Feb. 24, 1987.

Reargument Denied May 8, 1987.

Petition for Allowance of Appeal Denied Sept. 30, 1987.

318

John F. Pyfer, Jr., Lancaster, for appellants.

William P. Douglas, Carlisle, for appellees.

Before WIEAND, BECK and WATKINS, JJ.:

BECK, Judge:

The issue is whether a corporation or its officers are liable for conversion when they sell a farmer's cattle and pay the proceeds of the sale to the farmer where the cattle are subject to a third party's security interest.

This is an appeal by Shady Lane Dairy Sales, Inc. ("Shady Lane"), a family-owned corporation engaged in livestock auctioneering, and by its president Glenn D. Fite, from a grant of summary judgment. We affirm summary judgment against both Glenn D. Fite and Shady Lane.

## I. FACTUAL BACKGROUND

The Bank of Landisburg lent $46,925 for the purchase of 34 head of cattle to Curtis and Carol Burruss, a husband and wife engaged in farming operations in Cumberland County. The Burrusses purchased the cattle from Alfred Albright, who guaranteed the loan. In return, the Burrusses signed three security agreements granting Albright a security interest in the cattle. In these agreements, the Burrusses promised not to sell or otherwise dispose of the cattle without Albright's prior written authorization. Albright perfected his security interest by filing financing statements in the office of the Cumberland County prothonotary.

According to appellants Shady Lane and Fite the following events then occurred. The Burrusses contacted Shady Lane in order to arrange for the sale of their cattle. After visiting the Burrusses' farm, Fite hired a man to transport the cattle from Cumberland County to Shady Lane's place of business in Lancaster County. About four days later, an independent contractor acting for Shady Lane auctioned off the cattle for $24,170. Shady Lane retained $2507 as costs and commission and remitted the balance to the Burrusses, who took the money and promptly disappeared.

In essence, appellants maintain that Fite had no reason to suspect that the Burrusses had violated security agreements and that Fite at all times acted in good faith. However, it is undisputed that neither Fite nor anyone else associated with Shady Lane ever searched the records of the Cumberland County prothonotary's office to determine if a security interest was perfected as to the cattle.

## II. LIABILITY OF SHADY LANE CORPORATION

The theory of the Bank of Landisburg and Albright, the appellees, is that Shady Lane's sale of the cattle constitutes a conversion. In order to address this argument, we must consider the scope of the tort of conversion at common law.[1]

1. The common law, rather than Pennsylvania's Uniform Commercial Code, is controlling as to whether a secured party may bring suit for

■ Pennsylvania's appellate courts have not previously considered whether a broker of livestock may be held liable to a secured party for conversion. *See United States v. Sommerville,* 324 F.2d 712, 722 (3rd Cir.1963) (Steel, J., concurring), *cert. denied* 376 U.S. 909, 84 S.Ct. 663, 11 L.Ed.2d 608 (1964). Yet, in other jurisdictions, the clear weight of authority supports the view that a broker converts cattle when he sells them without the secured party's permission. *See United States v. Matthews,* 244 F.2d 626 (9th Cir., 1957); Annotation, *Personal Liability of Auctioneer to Owner or Mortgagee for Conversion,* 96 A.L.R.2d 208 (1964). This position has been adopted by federal courts applying Pennsylvania law. *United States v. Chesley's Sales, Inc.,* 523 F.Supp. 528 (W.D.Pa.1981); *United States v. Sommervile,* 324 F.2d at 718–725 (Steel, J., concurring). Similarly, we find that appellees have a cause of action for conversion.

■ Conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 451, 197 A.2d 721, 726 (1964). When such an act occurs, the plaintiff may bring suit if he had an immediate right to possession of the

conversion. 13 Pa.Cons.Stat.Ann. § 9306(b) (Purdon 1984) states: "Except where this division otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise ..." Comment 3 further explains: "In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser and other transferee. That is to say since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion." Nevertheless, the Code does not specify what is and is not an "appropriate case" for maintaining this cause of action. We must therefore resort to 13 Pa.Cons.Stat.Ann. § 1103 which states: "Unless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions." *See United States v. Sommerville,* 324 F.2d 712, 724–25 (3rd Cir.1963) (Steel, J., concurring) *cert. denied* 376 U.S. 909, 84 S.Ct. 663, 11 L.Ed.2d 608 (1964).

chattel at the time it was converted. *Potts Run Coal Co. v. Benjamin Coal Co.*, 285 Pa.Super. 128, 135, 426 A.2d 1175, 1178 (1981).

■ The security agreements between Albright and the Burrusses entitled Albright to "retake immediate possession" of the cattle if they were sold without his prior consent. By auctioning the cattle, Shady Lane intentionally—although perhaps unknowingly—interfered with Albright's use and possession of a chattel in which he had a property interest. We are therefore satisfied that a conversion took place.

Counsel for appellants contends that there can be no conversion unless the defendant has exercised a substantial degree of dominion or control over the property of another. Yet, counsel concedes that Shady Lane was in possession of the cattle for approximately four days, that Shady Lane had the cattle transported from county to county, and that Shady Lane had the cattle sold. Shady Lane clearly had a sufficient degree of control to be held accountable. In *Lindsley v. First National Bank of Philadelphia*, 325 Pa. 393, 190 A. 876 (1937), the Court found that a collecting bank which improperly credits a check to a depositor's account has exercised such dominion over the check so as to be liable for conversion to the true payee. *Lindsley* indicates that the extent of the control which a converter must have over a chattel is far less than counsel would have us believe.

We also note that appellants have not come forward with any evidence from which a jury could infer that Albright waived his security interest by consenting to the sale of the cattle. *Compare United States v. Walter Dunlap & Sons*, 800 F.2d 1232 (3rd Cir.1986); *East Central Fruit Growers Production Credit Ass'n. v. Zuritsky*, 346 Pa. 335, 30 A.2d 133 (1943) (mortgagee's acquiescence in sale of chattel through broker constitutes waiver).

We need only consider further whether Shady Lane should be shielded from liability on the grounds that its officer acted in good faith.

 Ordinarily, there is no inconsistency between finding that a defendant acted in good faith and finding that he is a converter. *See United States v. Matthews*, 244 F.2d at 626. Fraudulent intent is not an element of the tort of conversion. *Baker v. Rangos*, 229 Pa.Super. 333, 348, 324 A.2d 498, 505 (1974). Nevertheless, *First National Bank of Blairstown v. Goldberg*, 340 Pa. 337, 17 A.2d 377 (1941), indicates that there are unusual circumstances in which good faith will defeat a conversion claim under Pennsylvania law.

The *Goldberg* case concerned an attorney who innocently assisted a client in selling stolen negotiable bonds. The true owner of the bonds sued the attorney for conversion. The Court first noted that:

> ... the general rule, is, as formulated in Restatement, Agency, section 349, that 'An agent who does acts which would otherwise constitute conversion of a chattel is not relieved from liability by the fact that he acts on account of his principal and reasonably, although mistakenly, believes that the principal is entitled to possession of the chattels.

340 Pa. at 341, 17 A.2d at 379.[2] The Court, however, declined to apply this general rule on the grounds that to do so would thwart the purpose of the law regulating the exchange of negotiable bonds.

> The purpose of the Negotiable Instruments Law is to enhance the marketability of such securities and to allow bankers, brokers, and people generally to trade in them in confidence. That object would be defeated if liability were to be imposed upon one who, mistakenly but in good faith, deals with negotiable instruments on the assumption that they belong to the person who employs him to effect their sale through ordinary market channels.

340 Pa. at 343, 17 A.2d at 380. Accordingly, the Court found that since the attorney had demonstrated his good faith, he was not liable.

---

**2.** *See* Restatement (Second) of Agency § 349 (1958). *See also* Restatement (Second) of Torts § 233 (1965) (related principle).

■ *Goldberg,* stands for the principle that when the question of good faith is raised in response to a conversion claim, it is permissible for the court to consider the objectives of the commercial legislation regulating the exchange of the chattel which the defendant is accused of converting. In the case sub judice, the debtors' livestock were covered by security agreements which by their own terms were governed by the provisions of Pennsylvania's enactment of the Uniform Commercial Code (U.C.C.), 13 Pa.Cons.Stat. Ann. § 1101—§ 9507 (Purdon 1984). We conclude that finding Shady Lane liable will not frustrate the policies behind the U.C.C. even though Shady Lane's officers may have acted in good faith.

One purpose of Article 9 of the U.C.C. is to protect the interests of secured parties so that they will be willing to extend credit to farmers and other businessmen. *See Garden City Production Credit Ass'n v. Lannan,* 186 Neb. 668, 672–673, 186 N.W.2d 99, 102 (1971). Farmers who raise livestock are particularly dependent upon the availability of credit extended in return for pledging their livestock as collateral. *See* Note, *Commercial Law—Uniform Commercial Code—Security Interests in Livestock,* 8 Nat.Resources J. 183 (1968). Failing to impose liability on brokers may spur lenders to implement more restrictive credit policies which in turn may impede agricultural development. *See Id.*

Moreover, Article 9 establishes a comprehensive system for recording security interests. There is no evidence here that Albright did not properly file his financing statements or that Shady Lane could not have discovered these financing statements by conducting a search.[3] Imposing liability

---

**3.** We recognize that an auctioneer's efforts to search the recording system are complicated by 13 Pa.Cons.Stat.Ann. § 9401(a)(1) (Purdon 1984). Under that provision, a security interest in cattle is perfected merely by filing a financing statement with the prothonotary of the Pennsylvania county in which the debtor resides. On the other hand, for most types of collateral, the secured party can perfect his security interest only by filing both on the local county level and with the Secretary of the Commonwealth. *See* 13 Pa.Cons.Stat.Ann. § 9401(a)(3).

provides an incentive for corporations dealing in livestock to consult the Article 9 recording system. This will help prevent unauthorized sales of collateral by farmers. *See Production Credit Ass'n. of Chippewa Falls v. Equity Coop Livestock Sales Ass'n.*, 82 Wis.2d 5, 8, 261 N.W.2d 127, 128 n. 5 (1978).[4]

This is not to say that the U.C.C. exists solely in order to safeguard the secured party's investments. The U.C.C. balances the interests of the secured party and the interests of the other parties involved in the commercial transaction. For example, section 9307(a) protects a person who buys goods in the ordinary course of business from the claims of a creditor with a perfected security interest in the goods. This provision indicates that one objective of the U.C.C. is to facilitate free trade in chattels. In this sense, Article 9 is perhaps analogous to the Negotiable Instruments Law discussed in *Goldberg* which fostered free trade by implicitly protecting brokers as well as buyers.

The problem with applying this argument to the case sub judice is that the Burrusses' cattle were farm products. Unlike the policy in the *Goldberg* case, the policy of the U.C.C. as it relates to farm products is to protect the secured party. This policy is spelled out in section 9307(a) which provides:

> A buyer in ordinary course of business ... *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

13 Pa.Cons.Stat.Ann. § 9307(a) (Purdon 1984) (emphasis added).

---

**4.** In *Top Line Equip. v. National Auction Serv.*, 32 Wash.App. 683, 649 P.2d 165 (1982), the Washington Court of Appeals held that livestock brokers have constructive notice of security interests recorded pursuant to the U.C.C. Although we do not reach this issue, we believe that the existence of a public recording system is one factor which weighs against recognition of a special good faith exception to conversion for brokers.

The above quoted section protects the secured party rather than the buyer in the ordinary course of business in a dispute over farm products. In the instant case, the dispute is between the secured party and the broker. Yet, insofar as section 9307(a) favors the interests of creditors who have security interests in farm products, we find that the section is equally applicable to both brokers and buyers. The overall effect of this "farm products exception" to the buyer in ordinary course rule is to subordinate the goal of promoting the free movement of farm products to the goal of protecting a creditor's right to claim farm-related collateral. *See generally* Dolan, *Section 9–307(1): The U.C.C.'s Obstacle to Agricultural Commerce in the Open Market,* 72 Nw.U.L.Rev. 706 (1977). Therefore, we cannot say that holding a broker such as Shady Lane liable will interfere with legislative policy. The *Goldberg* case is clearly distinguishable.[5]

[6] In summary, we are not convinced that there is sufficient cause to exempt Shady Lane from the rules of conversion liability which ordinarily apply. When a corporation auctions livestock without the authorization of the secured party, it is liable for conversion without regard to good faith—at least where the broker could have learned of the security interest by resorting to the recording system, and where the livestock sold fall within the farm product exception of section 9307(a).

## III. LIABILITY OF CORPORATE OFFICER

Counsel for appellants argues that even if Shady Lane is guilty of conversion, its president, Glenn D. Fite, should not be held jointly and severably liable. The question of Fite's liability must be considered in light of *Wicks v. Milzoco*

---

**5.** As to the significance of the farm-product exception in depriving brokers of protection from liability for conversion, *See* 2 Grant Gilmore, *Security Interests in Personal Property,* § 26.10 (1965); Skilton, *Buyer In Ordinary Course of Business Under Article 9 of the Uniform Commercial Code (and Related Matters),* 1974 Wis.L.Rev. 1, 71. The farm products exception has been criticized by many commentators. The wisdom of that provision is a matter for the legislature to address.

*Builders,* 503 Pa. 614, 621–22, 470 A.2d 86, 90 (1983) in which the court stated that:

> Pennsylvania law recognizes the participation theory as the basis of liability.

> The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, not for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

*3A Fletcher, Cyclopedia of the Law of Private Corporations* § 1137, p. 207 (perm. ed. rev. 1975).

■ Under the particular facts of this case, we find that Fite's conduct involved a sufficient degree of participation in Shady Lane's tort to impose liability. Fite personally visited the Burrusses' farm to negotiate a sale of cattle, and he personally made arrangements for the delivery of the cattle to Shady Lane's auction. At the same time, Fite neglected to search the recording system himself, and he failed to delegate responsibility for searching the recording system to another. He must bear the consequences.[6]

### IV. MEASURE OF DAMAGES

Under Pa.R.C.P. 1035(b), summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Thorsen v. Iron & Glass Bank,* 328 Pa.Super. 135,

---

**6.** Professor Martin J. Aronstein has forcefully argued that a corporate officer whose acts directly lead to the breach of a security agreement, but who neither knew nor should have known of the existence of the security agreement, should not be held liable for conversion. *Good Faith Performance of Security Agreements: The Liability of Corporate Managers,* 120 U.Pa.Rev. 1, 37 (1971). We need not reach this issue since we believe that Fite could have learned of the existence of the Albright-Burruss security agreements if he had diligently searched the prothonotary's records.

476 A.2d 928 (1984). In light of the foregoing discussion, we affirm the grant of summary judgment against Shady Lane and Glenn D. Fite.

 Appellants contend that the trial court ·erred by awarding damages of $24,170. The measure of damages for conversion is the market value of the converted property at the time and place of conversion. *Northcraft v. Edward C. Michener Associates,* 319 Pa.Super. 432, 466 A.2d 620 (1983). This was the $24,170 which the cattle brought in at auction.

Judgment affirmed.