J-A12007-19

2019 PA Super 258

| | |
|---|---|
| SLT HOLDINGS, LLC, JACK E. MCLAUGHLIN AND ZUREYA MCLAUGHLIN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| MITCH-WELL ENERGY, INC. AND WILLIAM E. MITCHELL, JR., AN INDIVIDUAL, | |
| Appellants | No. 542 WDA 2018 |

Appeal from the Order Entered March 13, 2018
In the Court of Common Pleas of Warren County
Civil Division at No(s): A.D. 626 of 2013

BEFORE: BENDER, P.J.E., DUBOW, J., and FORD ELLIOTT, P.J.E.

OPINION BY BENDER, P.J.E.: **FILED AUGUST 23, 2019**

Mitch-Well Energy, Inc. ("Mitch-Well") and William E. Mitchell, Jr. ("Mr. Mitchell"), an individual, (collectively "Appellants"), appeal from the March 13, 2018 order dismissing without prejudice count VI of the amended complaint in equity filed by SLT Holdings, LLC ("SLT"), Jack E. McLaughlin and Zureya McLaughlin ("the McLaughlins") (collectively "Appellees").[1] After careful review, we affirm.

_____

[1] On January 9, 2018, summary judgment was entered in favor of Appellees on counts I, II, and V of Appellees' amended complaint in equity. Appellees' motion for voluntary dismissal of counts III and IV of its amended complaint was granted without prejudice by order of court dated February 1, 2018; however, said order was not entered on the docket until April 16, 2018 (four days after the filing of the notice of appeal). Thus, facially, the order from

The trial court summarized the factual background of this case as follows:

> This action concerns certain leases granting oil, gas, and mineral (OGM) rights for two parcels. Both parcels are in Warren County. The parties have referred to the parcels according to how they are identified for tax/recording purposes. The one parcel is within Warrant 3010 and the other is within Lot 769. [SLT] came to own the OGM rights for Warrant 3010, which it leased to a company that subsequently assigned the lease to [Mitch-Well]. [*See* SLT Lease, 5/30/85.] [The McLaughlins] came to own the OGM rights for Lot 769, which they leased to a company that subsequently assigned the lease to Mitch-Well. [*See* McLaughlin Lease, 5/30/85.][2] Neither of the above-described leases were recorded[,] but appropriate memoranda concerning those leases were recorded, as were the assignments to Mitch-Well.
>
> The leases are similar in that they both contain provisions requiring Mitch-Well to drill a certain number of wells on the two parcels … and to make specified minimum payments to lessors/[Appellees] each year if the royalties do not exceed said minimum payments…. Beginning around 1996 and ending around 2013, the wells on Warrant 3010 and Lot 769 operated by Mitch-Well did not produce OGM in marketable quantities. Thus[,] Mitch-Well made no royalty payments to [Appellees] during this time. Mitch-Well also failed to make minimum payments as required under both leases. For approximately sixteen years, Mitch-Well violated the leases by failing to either pay royalties in excess of the minimum annual payments or to make said minimum payments. Although Mitch-Well did visit the wells in question during this period, it did so to ensure that the wells remained safe and in compliance with applicable law. Mitch-Well did not attempt to achieve marketable levels of OGM production

which this appeal is taken appears interlocutory and unreviewable. However, "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." Pa.R.A.P. 905(a)(5). Hence, no jurisdictional defects impede our review.

2 The SLT Lease and the McLaughlin Lease are referred to collectively herein as "the leases."

between 1996 and 2013. It appears that the prevailing OGM prices hindered production in that it was not economical for Mitch-Well at that time.

In 2013, storage tanks connected to the wells on Warrant 3010 and Lot 769 had collected enough fluid to cause Mr. Mitchell to have them emptied[,] and their contents were transferred to two storage tanks located on a parcel referred to in this litigation as "Mitchell Farm[."] Mitchell Farm is owned by the Mitchell family. One of the storage tanks on Mitchell Farm was connected to one of three wells on Mitchell Farm. These three wells are owned by Mr. Mitchell[,] individually[,] and not by Mitch-Well. Mr. Mitchell allowed the fluid to settle in the two tanks on the farm so that the brine separated from the oil. Mr. Mitchell had an agreement with a company called Ergon, which then came and collected the oil and marketed it. Ergon remitted payment for the entirety of the gross production to Mr. Mitchell. Mr. Mitchell attempted to distribute the royalties to [Appellees] out of Mr. Mitchell's personal account. This attempt at payment was apparently not deposited. Mitch-Well did not have a bank account at the time[,] although it does now. Mitch-Well "probably" went five years without a bank account.

[Mr. Mitchell] is currently the sole owner, shareholder, officer, and employee of Mitch-Well….

There is a controversy surrounding an unnumbered subparagraph under ¶17 of both leases. The language in each of the leases is identical. The subparagraph provides for the retention of certain land by lessee/Mitch-Well even after termination of the lease. However, there is limiting language in the subparagraph. The subparagraph states that if Mitch-Well fails to meet its drilling obligations then the lease is terminated, but Mitch-Well shall retain 20 acres surrounding each well it drilled that is capable of producing oil and/or gas. This matter is further complicated by certain identical amendments to both leases. These amendments reduced the retained acreage from the 20 acres referenced above to only 5 acres. The enforceability of the amendments is disputed by [Appellants]. The amendments were signed by [Mitch-Well's] predecessor in interest rather than [Mitch-Well or Mr. Mitchell], and neither of the amendments was recorded nor was a memorandum recorded as with the leases themselves.

[Appellees] argue that because Mitch-Well has defaulted on the lease[s], the lease[s] ha[ve] terminated[,] or else [they have] been abandoned. [Appellants] argue[] that the leases do not allow for a finding of termination. [Appellants] rely on certain identical provisions in the two leases. Paragraph 2 of each lease purports to govern the length of the term of the lease. This paragraph provides in relevant part that each lease will continue in effect for so long as the lessee (Mitch-Well) determines that OGM can be produced in paying quantities. Thus, Mitch-Well has the exclusive power to end the term of the lease. Paragraph 12 of each lease is also identical[,] and it governs default and remedies. Termination of each lease is the exclusive remedy for default, but [Appellees] must comply with certain prerequisites. [Appellees] must give written notice to Mitch-Well describing the default. Mitch-Well has thirty days from receipt of the notice to cure said default. If a court subsequently determines that the default has not been cured, then the lease is terminated under its own provisions.

Trial Court Opinion ("TCO"), 1/9/18, at 1-5 (citations to record omitted).

Appellees commenced this action on November 19, 2013, with the filing of a complaint in equity against Appellants, seeking injunctive relief (Count I), a declaratory judgment (Count II), an accounting (Count III), ejectment (Count IV), conversion (Count V), and tortious interference with contract (Count VI).[3] On that same date, Appellees filed a petition for a preliminary injunction against Appellants, which was subsequently granted by the trial court on January 24, 2014. The preliminary injunction enjoined Appellants from physically entering upon Warrant 3010 and Lot 769, and from removing, selling, transferring or otherwise disposing of any material from either

_____

[3] An amended complaint was filed by Appellees on April 14, 2015.

property, "including fixtures, whether oil, gas, or mineral." Trial Court Order, 2/14/14.[4]

On July 26, 2017, Appellees filed a motion for partial summary judgment relating to counts I, II, and V, which was granted by the trial court on January 8, 2018, after hearing argument thereon. A jury trial was scheduled on the remaining counts III, IV, and VI; however, the trial court subsequently granted without prejudice Appellees' motions for voluntary dismissal regarding these counts. On April 12, 2018, Appellants filed a timely notice of appeal. No order was issued by the trial court directing the filing of a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellants now present the following issues for our review, which we have renumbered for ease of disposition:

1. Did the trial court err in granting summary judgment in favor of [Appellees] and against [Appellants] on its claim for declaratory judgment?

2. Did the trial court err in granting summary judgment in favor of [Appellees] and against [Appellants] on its claim for permanent injunction?

3. Did the trial court err in granting summary judgment in favor of [Appellees] and against [Appellants] on its claim for conversion?

4. Did the trial court err in granting voluntary dismissal without prejudice and without hearing on [Appellees'] claim for accounting, ejectment, and tortious interference with contract?

Appellants' Brief at 5 (unnecessary capitalization omitted).

_____

[4] The preliminary injunction was affirmed by this Court on appeal at no. 460 WDA 2014.

Our standard of review with respect to a trial court's decision to grant or deny a motion for summary judgment is well-settled:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

**Thompson v. Ginkel**, 95 A.3d 900, 904 (Pa. Super. 2014) (citations omitted).

We further note:

[A] lease is in the nature of a contract and is controlled by principles of contract law. **J.K. Willison v. Consol. Coal Co.**, 536 Pa. 49, 54 637 A.2d 979, 982 (1944). It must be construed in accordance with the terms of the agreement as manifestly expressed, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." **Id.** (citations omitted). Further, a party seeking to terminate the lease bears the burden of proof. **See Jefferson County Gas Co. v. United Natural Gas Co.**, 247 Pa. 283 286, 93 A. 340, 341 (1915).

**T.W. Phillips Gas and Oil Co. v. Jedlicka**, 42 A.3d 261, 267 (Pa. 2012).

[Our] Supreme Court has aptly observed that "[t]he traditional oil and gas 'lease' is far from the simplest of property concepts." **Brown v. Haight**, 435 Pa. 12, 255 A.2d 508, 510 (1969). In the context of oil and gas leases, the title conveyed is inchoate and initially for the purpose of exploration and development. **Calhoon v. Neely**, 201 Pa. 97, 50 A. 967, 968 (1902); *accord* **Burgan v. South Penn Oil Co.**, 243 Pa. 128, 89 A. 823, 826 (1914) ("The title is inchoate, and for purposes of exploration only until oil is found."). If development during the primary terms is unsuccessful, no estate vests in the lessee. **Id.** If oil or gas is produced, the right to produce becomes vested and the lessee has a property right to extract the oil or gas. **Calhoon**, 50 A. at 968…. In such circumstances[,] the lessee will be protected in accordance with the terms of the lease and will be required to operate the leasehold for the benefit of both parties. **Venture Oil Co.**, 25 A. at 734; **Calhoon**, 50 A. at 968; **Burgan**, 89 A. at 826.

**Jacobs v. CNG Transmission Corp.**, 332 F.Supp.2d 759, 772-73 (W.D. Pa. 2004).

In **Jedlicka**, our Supreme Court further explained that,

oil and gas leases generally contain several key provisions, including the granting clause, which initially conveys to the lessee the right to drill for and produce oil or gas from the property; the habendum clause, which is used to fix the ultimate duration of the lease; the royalty clause; and the terms of surrender....

* * *

Typically, ... the habendum clause in an oil and gas lease provides that a lease will remain in effect for as long as oil or gas is produced "in paying quantities." Traditionally, use of the term "in paying quantities" in a habendum clause of an oil or gas lease was regarded as for the benefit of the lessee, as a lessee would not want to be obligated to pay rent for premises which have ceased to be productive, or for which the operating expenses exceed the income. More recently, however, and as demonstrated by the instant case, these clauses are relied on by landowners to terminate a lease.

**Jedlicka**, 42 A.3d at 267-68 (citations and footnote omitted).

Instantly, the habendum clause in each of the leases provides that the lease "shall be in force for a primary term of five (5) years from the effective date of this lease, and for as long thereafter as oil or gas or other substances covered hereby are or can be produced in paying quantities…."  SLT Lease at 1¶2; McLaughlin Lease at 1¶2.  The leases further provide:

> 5) Rental Payment – This Lease is made on the condition that it will become null and void and all rights hereunder shall cease and terminate unless work for the drilling of a well is commenced … within ninety (90) days and prosecuted with due and reasonable diligence, or unless the Lessee shall pay to the Lessor, in advance, every twelve (12) months until work for the drilling of a well is commenced, the sum of Twelve Dollars ($12.00) per acre, that is Thirty-Six Hundred Dollars ($3,600.00) for each twelve (12) months during which the commencing of such work is delayed.[5]
>
> 6) Continuing Operations – If, at the end of the primary term or any time thereafter, this lease is not being kept in force … but [Mitch-Well] is then engaged in drilling, reworking or any other operation calculated to obtain production on the leased premises or lands pooled therewith, this lease shall remain in force as long as … such operations are conducted in a reasonable, prudent manner and, if such operations result in production of oil or gas or other substance covered thereby, as long thereafter as production continues in paying quantities.
>
> ***
>
> 8) Shut-In Gas Royalty – Notwithstanding anything herein to the contrary, if all wells on the leased premises are capable of producing gas in paying quantities but the wells are shut-in, such wells shall nevertheless be considered as though the wells are producing gas in paying quantities for the purpose of maintaining this lease in effect by Lessee on or before the end of each calendar

_____

[5] The SLT Lease requires the sum of "Five Dollars ($5.00) per acre" (or $4,950.00) to be paid to the lessor every twelve (12) months until work for the drilling of a well is commenced.  SLT Lease at 2¶5.  Aside from the difference in acreage and dollar amounts noted herein, the operative language of the SLT Lease is essentially the same as in the McLaughlin Lease.

year in which the wells are shut-in, pay Lessor a shut-in gas royalty equal to the delay rental provided for herein prorated by the number of days the wells were shut in.

McLaughlin Lease at 2.

Thus, by its own terms, paragraph 8 of the leases provides for the extension of each lease by allowing payment of shut-in gas royalties when the well(s) are capable of producing gas in paying quantities. **See** Trial Court Memorandum ("TCM"), 2/14/14, at 3. "It follows logically that if no shut-in gas royalties are paid and the wells are capable of production, then the lease terminates." **Id.** Additionally, the trial court noted that in accordance with paragraph 6, the leases terminate whenever oil, gas or minerals are not produced in paying quantities. **Id.** Here, the record establishes that no shut-in payments were paid to Appellees under either lease, nor were oil and gas produced in paying quantities from the land for over twenty-five years. **See id.**

In accordance with paragraph 17 of the leases, Appellants promised to drill one well during the first year and five additional wells each year thereafter, until a total of thirty (30) wells were drilled under the McLaughlin Lease, and a total of 20 wells drilled under the SLT Lease. **See** McLaughlin Lease at 3-4¶17; SLT Lease at 3-4¶17. Each lease also stated it would terminate if Appellants failed to perform this drilling commitment, with the exception that Appellants would retain the twenty (20) acres surrounding each well drilled which was capable of producing oil and/or gas pursuant to the lease. **See id.** On February 20, 1986, unrecorded amendments of each lease

were entered into, which reduced the lessee's retained property rights from twenty (20) acres to five (5) acres of land surrounding each well for any wells drilled during the term and capable of producing oil and/or gas.

The following additional findings of fact were set forth by the trial court:

[T]he initial term of one (1) year with which to drill [under ¶17 of] both the SLT … [L]ease and the McLaughlin [L]ease was extended for a period of thirty (30) days until June 30, 1986, giving lessee, Mitch-Well, more time to drill its first well on each of the two properties. Before the initial term expired, on or about May 15, 1986, one well was drilled on both the SLT property and the McLaughlin property. No other wells were drilled on either property until approximately 2011 by Utica Resources, Inc. [("Utica")].[6] The total number of wells to be drilled remained unchanged at twenty (20) on the SLT property lease and thirty (30) on the McLaughlin property lease.

Mr. McLaughlin stated in his affidavit that from at least January 17, 1991 through November 3, 2013, he received no payments of any kind, including royalty payments, delay rental payments or any other type of payments for the leases at issue. Similarly, Richard C. Cochran, manager of SLT Holdings, LLC, testified that neither SLT Holdings, nor its predecessor in interest, Sheffield Land and Timber Company, a company in which he was also involved, had ever received royalty payments, delay rental payments or any other type of payments.

Furthermore, there was no physical indication at the 1986 well sites that the wells were either producing or capable of producing oil and gas. Testimony indicated that no motor, brine tank, power source, equipment or other indication that the wells were producing or capable of producing was observed at or near either well. In fact, testimony indicated that the post upon which the motor had once rested was rusty, indicating the motor had

---

[6] Utica entered into an OGM lease with both SLT and the McLaughlins on March 17, 2011. *See* TCM at 6. The trial court found that upon execution of its leases, "Utica began performing its obligations thereunder, including preparing for drilling operations, and actually drilling five (5) wells in the first two years of the Utica leases." *Id.*

- 10 -

not been there for some time. Additionally, no brine tank was found on site, and although testimony indicated that an oil and gas well need not necessarily have a brine tank nearby in order to be in production, the industry standard is for a brine tank to be placed nearby the well. Thus, the absence of a brine tank is rare. In fact, testimony indicated that the May 1986 Mitch-Well drill site was overgrown with weeds and undergrowth. The Affidavit of Jack E. McLaughlin indicated that fallen timber and logs blocked paths used to access the well site, and that said pathways were impassible for over two consecutive years. A report filed by the Pennsylvania Department of Environmental Protection indicated that as early as March 27, 1990, the well sites had been abandoned.

On October 18, 2015, McLaughlin filed an Affidavit of Non-Production with respect to the McLaughlin [L]ease. Along the same lines, on February 6, 2012, Sheffield Land and Timber Company filed an Affidavit of Non-Production with respect to the SLT [L]ease. Each affidavit stated that there had been no production of oil and gas on the property at issue and that the 1986 Lease had expired.

TCM at 5-6.

As a result of Appellants' failure to maintain their drilling commitment and/or otherwise remit delay rental payments, Appellees sought judgment in their favor declaring that Appellants have no rights with respect to either Warrant 3010 or Lot 769. *See* Complaint in Equity, 1/19/13, at 19-20. The trial court granted summary judgment on Appellees' claim for declaratory judgment after concluding that the leases had been abandoned by Appellants. Herein, Appellants assert that the granting of summary judgment in favor of Appellees constituted an error as a matter of law by the trial court. Appellants' Brief at 21. Appellants maintain that there are several issues of material fact, including whether or not abandonment occurred, which should have prevented the entry of summary judgment. Appellants also contend that the trial court's

- 11 -

finding of abandonment was an error of law.  After careful review, we deem

Appellants' claim to be meritless.

In support of its finding of abandonment, the trial court opined:

> The instant case is analogous in all relevant aspects to the seminal case of *Jacobs*…, 332 F.Supp.2d [at] 759…(interpreting Pennsylvania law).[7]  *Jacobs* also involved a lawsuit over an oil and gas lease brought by plaintiffs/lessors against defendant/lessee.  *Id.*  Plaintiffs sought relief in the form of a judicial determination that the lease was terminated.  *Id.*  As in the instant case, the lease in *Jacobs* was a "drill or pay" lease, meaning that the lessee/defendant was required to pay a specified rental fee if it did not produce oil or gas and make royalty payments.  The term of the lease in *Jacobs* was also divided between a primary term and an indefinite period thereafter, similar to the provisions in paragraph 2 of the leases under consideration in the instant case.  *Id.*  The *Jacobs* defendant had not produced oil or gas on the property in almost forty-eight years.  *Id.* at [] 793.  Plaintiffs asked the *Jacobs* court to find that the lease had terminated notwithstanding the rental payments in lieu of production, and the court did so for the reasons discussed below.  *Id.* at [] 783-96.  The instant case differs only insofar as neither [Appellant] paid [Appellees] the minimum annual payment required by ¶ 18 of both leases during the period of no production.
>
> The *Jacobs* court offered multiple, independent rationales for its decision.  One rationale offered by the court was based on an analysis of the lease and a concomitant finding that the term of the lease had expired.  *Id.* at [] 783-96.  A second, independent rationale given by the *Jacobs* court was that the defendant had abandoned the lease.  The proposition that an oil and gas lease

_____

[7] We disregard Appellants' assertion that the trial court improperly followed *Jacobs*, rather than *Jedlicka*.  The trial court's reliance on *Jacobs* was proper, as the facts in *Jacobs* are analogous to the instant case and the *Jacobs* Court applied relevant Pennsylvania law.  *Jedlicka*, on the other hand, is distinguishable because, unlike in the present matter, the crux of the dispute in *Jedlicka* was the meaning of the term "in paying quantities" under the lease and the focus of the Court was on determining the proper test for evaluating whether oil or gas has been produced "in paying quantities."  *See Jedlicka*, 42 A.3d at 267-68.

- 12 -

may be abandoned arises from the implied covenant to produce that is read into oil and gas leases. *Id.* The court found that "the clear purpose of an oil and gas lease providing for production royalties … is to develop the property for the mutual benefit of both parties, regardless of whether the lease contains an expressed provision obligating the lessee to do so." *Id.* at 789 (citing ***Ray v. Western Pennsylvania Nat'l Gas Co.***, 138 Pa. 576, 20 A. 1065 (Pa. 1891)). An obligation to make payments in lieu of production royalties is only intended to spur the lessee toward development and compensate the lessor for the delay. *Id.* The ***Jacobs*** court expressly rejected the proposition that the defendant could indefinitely postpone development of the property by paying rental fees in place of royalties. *Id.* at 790. This proposition would render the lease "a mere option[."] *Id.*

The doctrine of abandonment was first applied to an oil and gas lease in the case of ***Aye v. Philadelphia Co.***, 193 Pa. 451, 44 A. 555 (1899), which was approvingly cited by the ***Jacobs*** court. The ***Aye*** court found that the lessee in an oil and gas lease has an obligation to diligently develop the leased property and a failure to do so constitutes abandonment. *Id.* The question of whether or not abandonment has occurred is one of fact and the [c]ourt must analyze the acts and intentions of the parties to the lease. *Id.* The ***Aye*** court specifically found that *four years of inaction by a lessee gives rise to a presumption of abandonment*. *Id.* If the lessee fails to present a valid explanation for the inaction then judgment as a matter of law is appropriate. *Id.*

In the instant case, there was a prolonged period of inactivity by [Appellants] concerning production at the relevant wells. This period was approximately sixteen years long, which is far longer than the four year period contemplated by the ***Aye*** court. Mr. Mitchell's deposition testimony suggests that his explanation for this inactivity is that the price of OGM had fallen so dramatically that [Appellants] could not make money by producing at the wells in question. Transcript of Deposition of William Mitchell[, 5/19/17,] at [] 75-76, 84. The [c]ourt does not find this to be a valid explanation that will defeat the presumption of abandonment. If the [c]ourt found otherwise, then the leases would be reduced to mere options and the implied covenant to produce would be practically insignificant.

TCO at 5-7 (emphasis added). We discern no genuine issue of material fact, and we deem the trial court's finding of abandonment to be adequately supported by the record.

Appellants further assert that the granting of a permanent injunction barring Mitch-Well from entering onto Warrant 3010 and Lot 769 to produce oil and gas from the wells drilled by Mitch-Well thereon is inappropriate. Appellants' Brief at 35. Appellants maintain that, pursuant to ¶17 of the leases, Mitch-Well owns twenty acres surrounding the well it drilled on each lot. *See id.* at 39. However, contrary to Appellants' assertion, the trial court succinctly determined that "[b]ecause the [c]ourt finds that [Appellants] abandoned the leases, the provisions at ¶17 of both leases which allow for the retention of acreage around wells by lessee are nullities." TCO at 7. Considering our determination that the trial court properly found that Appellants abandoned the leases, we agree with the trial court's decision that Appellants' right to enter upon either property has also extinguished.

Next, we address Appellants' claim regarding conversion. Appellees claim that Appellants' removal of oil from the tanks on Warrant 3010 and Lot 769 in 2013 and the marketing of the oil through Ergon constituted conversion. Appellants admit that Mitch-Well entered onto the SLT and McLaughlin properties, pumped a total of 88.53 barrels of oil from the tanks and sold the oil for a total of $9,069.53 (or $100.1987 per barrel). Appellants' Brief at 32. Appellants argue, however, that there could be no conversion because Mitch-Well was the owner of the oil at the time. *Id.* at 33.

- 14 -

> The tort of conversion involves interference with another's property rights in a chattel, such as by possession without consent or justification. **Stevenson v. Economy Bank of Ambridge**, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964); **Bank of Landisburg v. Burruss**, 362 Pa. Super. 317, 524 A.2d 896 (1987)…. A conversion takes place when a party: acquires possession of goods, with an intent to assert a right to them which is in fact adverse to that of the owner; transfers the goods in a manner which deprives the owner of control; unreasonably withholds possession from the one who has the right to it; and seriously damages the chattel in defiance of the owner's rights. [**Norriton East Realty Corp. v. Central-Penn National Bank**, 245 A.2d 637, 638 (Pa. 1967)]. Thus[,] it is sufficient where a party takes possession of another's goods to the detriment of the owner and keeps and disposes of them in a way that gives rise to damages.

TCO at 7-8. Appellants' argument that the sale of oil through Ergon did not constitute conversion is based on the faulty conclusion that Mitch-Well maintained the rights to the oil at the time it was marketed to Ergon.

Applying the foregoing principles of conversion to the instant matter, the trial court stated:

> [Appellants] argue that they owned the oil in question and thus there was no conversion. The [c]ourt is convinced that [Appellants] sincerely believed that they owned the oil at the time, but that is irrelevant to the court's analysis. The tort of conversion does not rest on proof of specific intent to commit a wrong. [**Norriton East Realty Corp.**, 245 A.2d at 638]. The [c]ourt must apply an objective standard and in light of the above finding of abandonment the [c]ourt finds that [Appellants] were not the owners of the oil. Upon [Appellants'] abandonment, the McLaughlins re-entered onto the previously-leased property. The fact of re-entry is evidenced by the signing of a new lease between the McLaughlins and another business ("Utica") for the OGM rights to Lot 769 in 2009 or 2010. Transcript of Deposition of [Mr.] Mitchell at p. 102. [Mr.] Mitchell also alleges that the McLaughlins produced oil from "his" well in 2011, marketed it themselves and kept the revenue. [**Id.** at] 95-99. For these reasons, the [c]ourt finds that [Appellants'] actions in 2013 did amount to conversion.

- 15 -

TCO at 8. Based on the trial court's finding of abandonment and Appellants' own admissions, we conclude that Appellants have failed to establish any material issue of fact. We discern no error of law in the trial court's finding of conversion.

Lastly, Appellants withdraw their claim regarding whether the trial court erred in granting voluntary dismissal; thus, we need not reach the merits of this issue.

For the reasons stated above, we conclude that Appellants failed to establish any genuine issue of material fact. Accordingly, we discern that the trial court did not commit an error of law or abuse its discretion when it granted Appellees' motion for summary judgment on counts I, II, and V of its amended complaint. We affirm the March 13, 2018 order dismissing count VI without prejudice.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/23/2019