**[J-92-2020] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | |
|---|---|
| SLT HOLDINGS, LLC, JACK E. MCLAUGHLIN, AND ZUREYA MCLAUGHLIN, | No. 6 WAP 2020 |
| | |
| | Appeal from the Order of the Superior Court entered August 23, 2019, at No. 542 WDA 2018, affirming the order of the Court of Common Pleas of Warren County entered March 13, 2018, at No. 626 of 2013. |
| Appellees | |
| v. | |
| MITCH-WELL ENERGY, INC., AND WILLIAM E. MITCHELL, JR., AN INDIVIDUAL, | ARGUED: October 22, 2020 |
| Appellants | |

## CONCURRING AND DISSENTING OPINION

**JUSTICE WECHT**            **DECIDED: APRIL 29, 2021**

In *Hutchison v. Sunbeam Coal Corp.*,[1] this Court reaffirmed a principle that long has governed our approach to oil, gas, and mineral contracts.

> In letting land for the extraction of minerals, an obligation to pay minimum advance royalties does not create an implied duty to mine under Pennsylvania law. We have never implied such a duty and decline to do so now.
>
> In coal mining leases, where the consideration for the privilege of removing the mineral is a royalty on the amount extracted, it is common for the parties to stipulate that a minimum advance royalty will be paid to the landowner if no mining is done. . . . In *Hummel v. McFadden*, 150 A.2d 856 (Pa. 1956), this Court implied a duty to mine in a lease agreement which did not provide for minimum royalties in the absence of mining. There, the implied covenant imposed upon the mining company a duty to commence operations in order

---

[1]     519 A.2d 385 (Pa. 1986).

to provide the landowner some return on his agreement. Our holding in *Hummel* leaves the contracting parties free to bargain for a provision addressing the amount and type of consideration to be paid in lieu of forfeiture should the mining company fail to commence mining operations. Pennsylvania courts have reasoned that minimum advance royalties are in the nature of liquidated damages for the lessee's failure to mine. . . . Such reasoning recognizes minimum advance royalties as the consideration flowing from the coal company to the landowner in lieu of the tonnage royalties which would be paid if mining operations were undertaken. Implying a duty to mine in the face of a minimum advance royalty clause ignores the terms agreed to by the contracting parties.[2]

In this case, the Leases,[3] in providing for "Shut-In Gas Royalties" (hereinafter, "Shut-In Royalty") that appear to have no time limitation,[4] can be said to reflect the leasing parties' recognition of the prospect of non-production *and* their bargained-for intention to ensure a monetary benefit to Lessors if Lessees fail to produce in sufficient quantities to

---

[2]     *Id.* at 388 (cleaned up); *accord Jacobs v. CNG Transmission Corp.*, 772 A.2d 445, 454-55 (Pa. 2001) (applying the same reasoning to a natural gas lease).

[3]     As set forth by the Majority, the interests upon which the instant claims are founded changed hands during the terms of the Leases for Warrant 769 (hereinafter "the McLaughlin Property") and Warrant 3010 ("the SLT Property"). *See* Maj. Op. at 2-4; *see also* Tr. Ct. Op., 1/9/2018, at 1-2; Am. Compl. at 3-6. For ease of reference, I refer hereinafter to Appellant-Lessees Mitch-Well Energy, Inc., and William E. Mitchell, Jr., collectively as "Lessees" and Appellee-Lessors SLT Holdings, LLC, Jack E. McLaughlin, and Zureya McLaughlin collectively as "Lessors." I refer to the corresponding leases as the "McLaughlin Lease" and the "SLT Lease," collectively the "Leases." Hereinafter, I cite the McLaughlin Lease provisions, which are materially identical to the corresponding terms of the SLT Lease.

[4]     *See, e.g.*, McLaughlin Lease at 2 ¶ 8 (providing for temporarily "shut-in" wells, and prescribing a royalty by cross-reference to ¶ 5 ("Rental Payment"), prescribing advance payment, every twelve months, of $12.00 per acre). Paragraph 18 of the McLaughlin Lease provided for a minimum payment of $5 per acre per twelve months when the royalty does not exceed that amount. The SLT Lease provided similarly, albeit at a different rate per acre. *See* Maj. Op. at 2-3 & n.2. I elect the "Shut-In Royalty" language because there is no question that both wells produced in paying quantities before Lessees ceased operations, and it has been Lessees' position that the wells, despite being inactive presently, satisfy the legal definition of "in paying quantities," as that term is used in oil and gas leases.

pay royalties equal to or greater than the Shut-In Royalty. That Lessees patently breached their contractual duty in this regard for at least sixteen years, after a relatively brief initial period of production, does not transform this case into one sounding in equity, even if the result arguably is inequitable; any remedy must spring from the Leases themselves.[5] In this regard, I agree with the Majority.

The temptation to resort to equity arises from what is difficult not to interpret as Lessees' bad-faith. After a few years of minimal production that did not even approach the number of working wells Lessees agreed to establish (conditions permitting),[6] Lessees ceased operations entirely and thereafter made no effort to avail themselves of their subsurface rights. During that span, Lessees ignored communications by Lessors expressing their concern over the inactivity and their belief that Lessees were in default under the Leases. In effect, Lessees made it plain for years on end that they intended to do nothing with their rights to well over a thousand acres spanning two properties— including pay for them.

In long-term or indefinite leases, such as those before us, a fixed Shut-In Royalty diminishes in value over time by virtue of inflation and other market forces, such that the

---

[5]     *But see* Tr. Ct. Op., 1/9/2018, at 6 (citing *Jacobs v. CNG Transmission Corp.*, 332 F. Supp.2d 759 (W.D. Pa. 2004)) ("An obligation to make payments in lieu of production royalties is only intended to spur the lessee toward the development and compensate the lessor for the delay. The *Jacobs* court expressly rejected the proposition that the defendant could indefinitely postpone development of the property by paying rental fees in place of royalties. This proposition would render the lease a mere option." (citations omitted)).

[6]     McLaughlin Lease at 3 ¶17 (obligating Lessees to drill, "if warranted," one well during the first year of the lease, and five wells each year thereafter until thirty wells are drilled). Lessees drilled only one well on each of the Properties.

lessor in each passing year receives less and less value for granting his or her rights to the lessee. But we may not inquire as to the soundness of the bargain; we may ask only whether the agreement has all the contours of a binding contract, including consideration, however imbalanced we may believe it to be.[7] Notably the Shut-In Royalty provisions are not the only ones that reflect the contracting parties' clear intention to hedge against non-production. The Leases also specify that only a court can terminate the lease—and only if Lessors provide written notice of default and a thirty-day period during which Lessees have the opportunity to cure the default.[8] And as the Majority notes, where a contract expressly provides for the remedies available in the event of breach, the court should not reach outside its four corners in search of an equitable remedy. So per *Hutchinson* and *Jacobs*, the Leases must govern, and must be construed consistently with the law of contract.[9]

But unlike the Majority, I find no cause to question that notice and an ample opportunity to cure were provided in this case. First, the Leases' written notice

---

[7] *See Hillcrest Found. v. McFeaters*, 2 A.2d 775, 778 (Pa. 1938) ("It is an elementary principle that the law will not enter into an inquiry as to the adequacy of the consideration" for a contract (quoting 1 WILLISTON ON CONTRACTS § 115 (rev'd ed.))); *Dreifus v. Columbian Exposition Salvage Co.*, 45 A. 370, 371 (Pa. 1900) ("In the absence of fraud, the courts never inquire into the adequacy of the consideration of an agreement.").

[8] *See* McLaughlin Lease at 3 ¶ 12 ("Default and Election of Remedies—In the event of a default, Lessor agrees to notify Lessee in writing as to the nature of the default and Lessee shall have thirty (30) days from receipt of Lessor's notice to cure such default. . . . Lessor agrees that its exclusive remedy shall be to terminate this lease in the event a court of law determines that the default has not been cured as hereinabove provided.").

[9] *See J.K. Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994). Unambiguous contracts are interpreted by the court as a matter of law. *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 469 (Pa. 2006).

requirements do not specify the form such notice must take, and it is undisputed that Lessors sent, and Lessees received, Affidavits of Non-Production asserting default under the Leases—in 2005 as to the McLaughlin Property and in 2012 as to the SLT Property.[10] In the absence of more contractual particularity regarding the form such notice should take, I would construe the Leases in a common-sense fashion, concluding that Lessees received written notice of default.[11] And given the delay between those notices and the initiation of this action, Lessees indisputably had *years* to cure by resuming activity or by

---

[10] *See* Aff. of Non-Production, Am. Compl., Ex. U (asserting that "there has been no production upon the premises of [the McLaughlin Property], and that the McLaughlin Lease "[has] expired, and that [its] terms have not been adhered to by [Lessee], and that, therefore, at this time the [McLaughlin Lease has] been abandoned, and [is] void"), Ex. T (SLT asserting that "since they have owned [the SLT Property] there has been no activity on the subject acreage," "[t]here has been no royalty paid," "there is no equipment of any kind located" on the SLT Property, and "[a]s a result of the above [the SLT Lease] has been forfeited as per its terms").

[11] The Majority disregards the affidavits of non-production in this connection, asserting that Lessors only "argue that their complaint should be deemed such a notice." Maj. Op. at 12. This narrowing inference contradicts Lessors' brief. *See* Lessors' Br. at 25 ("The questionable applicability of the notice provision and its lack of specificity confirm it is not a competent basis to disturb the trial court's entry of summary judgment. First, *both [Lessors] filed Affidavits of Non-Production prior to the commencement of these proceedings.*" (emphasis added)). The Majority then turns the passage of years between the commencement of non-production, the transmission of the affidavits of non-production, and the filing of the first complaint against Lessors, characterizing it as an "attempt to bypass the notice requirement and avoid any statute of limitations attendant with such delay." Maj. Op. at 13. Relatedly, the Majority suggests that laches would render Lessors' claim of abandonment—assuming it was viable—"problematic" for want of due diligence. Be all of that as it may, by rule, a defendant must raise statute of limitations and laches defenses in their answer to the complaint as "new matter," failing which, the defenses will be waived. *See* Pa.R.C.P. 1030 (specifying that statute of limitations and/or laches must be raised in new matter); Pa.R.C.P. 1032(a) ("A party waives all defenses and objections which are not presented either by preliminary objection, answer or reply."). Lessees raised neither. Accordingly, those defenses have been waived. Moreover, under the clear terms of the Leases, Lessees continue to be in breach with every passing year that they do not produce or pay Lessors the Shut-In Royalty.

paying the Shut-In Royalty. Second, in light of Lessors' Amended Complaint and their Motion for Partial Summary Judgment, as well as the trial court's comments, I would read the trial court's ruling as comprising precisely the judicial termination of the Leases for default that the Leases, themselves, require.

The Majority, viewing the case less holistically, believes that the trial court erred in granting summary judgment, concluding:

> It was incumbent upon the trial court to address [Lessors'] motion for summary judgment to determine if an adequate remedy at law existed through a contract analysis of the specific provisions of the [Leases], including the obligation for [Lessors] to provide notice of default and [an] opportunity to cure, the prescribed exclusive remedy for breach, and any retained rights [Lessees] may have in the event of termination.[12]

Ostensibly, the Majority adopts this cautious approach because it views the trial court's ruling as based *solely* upon abandonment because that is the theory Lessors pursued most vigorously and, until now, successfully.

But the Majority also acknowledges that Lessors' Motion for Partial Summary Judgment was not so confined: "[Lessors] alleged in their motion for partial summary judgment [that Lessees] admitted [they] breached material terms of the lease for nearly 20 years, for which [Lessors] sought a finding that their rights '**terminated** or otherwise lapsed' as a matter of law."[13] And reviewing Lessors' motion shows still more evidence that Lessors sought a ruling based upon either termination *or* abandonment. Referring to Lessees' admissions, Lessors asserted that Lessees' failure to perform "operate[d] as a termination of both [L]eases," adding that, "*[a]lternatively,* [Lessees'] admitted conduct

---

[12]     Maj. Op. at 14.

[13]     *Id.* at 10 n.8 (Majority's emphasis).

constitutes an abandonment of the Leases."[14]  And though the Majority opines that Lessors "did not distinguish among the remedies sought," the Motion suggests not so much a *lack* of specificity, but rather a prayer for relief *in the alternative*: "[U]nder either construction, [Lessees'] admissions confirm their rights to [the Properties] terminated or otherwise lapsed several years ago, as a matter of law."[15]  Thus, it cannot fairly be said that Lessors did not seek termination as a remedy.  In specifically seeking declaratory judgment establishing their "undisputed right to the properties at issue,"[16] Lessors sought *legal* rather than equitable relief, or at least did not foreclose such relief in favor of the equitable injunctive relief Lessors also sought.  Notably, the corresponding section of Lessors' proposed order provided:  "Because [Lessees] failed to remit the payments required by Paragraph 18 of the Leases . . ., any rights either of the [Lessees] ever held with respect to said properties are hereby **TERMINATED**."[17]  This posited a legal remedy for a breach of the Leases, one that—if granted in those terms—would have rendered moot the separate prayer for injunctive relief.

For this reason, I would not be as parsimonious as the Majority, inviting further litigation of a question that seems settled.  Lessors provided an undisputed basis upon which to decide the claim on a contractual basis, and the trial court's ruling taken as a whole foreclosed any effective defense to termination, even if its discussion highlighted

---

[14]     Mot. for Partial Summ. J. at 13 ¶ 30.

[15]     *Id.* at 13 ¶ 31.

[16]     *Id.* at 14 ¶ 35.

[17]     *Id.* at 19, Proposed order ¶ 2(a) (emphasis in original).

abandonment principles.[18]  Near categorical non-performance spanning nearly two decades is as material a breach as one will find, and there can be no question that the trial court perceived the Leases as terminated as part and parcel of its broader, more problematic finding of equitable abandonment.  That the latter aspect of the trial court's ruling is infirm does not taint the trial court's clear determination that, en route to what the court deemed abandonment, Lessees materially breached the Leases.[19]  The trial court

---

[18]     Notably, the trial court interpreted Lessors' complaint as seeking relief on the basis of either termination or abandonment.  *See* Tr. Ct. Op., 1/9/2018, at 4 ("[Lessors] argue that because [Lessees have] defaulted on the lease[s], the lease[s have] terminated or else [they have] been abandoned.").

[19]     The breadth of the trial court's findings in this regard is reflected in its determination that Lessees would not be entitled to the retained acreage nominally provided for in the Leases.  *See* Tr. Ct. Op., 1/9/2018, at 7 ("Even if the [c]ourt were to apply the terms of ¶ 17 as though the [L]eases were still in effect, the limiting language contained therein precludes application to the instant case.  The retention of acreage around wells is only permitted when the wells are capable of producing oil and/or gas.  The wells in question went approximately sixteen years without producing a marketable quantity of oil and/or gas."); *see also* McLaughlin Lease at 4 ("In the event [Mitchell] fails to fulfill [his] drilling commitment . . ., this lease will terminate with the exception that the Lessee shall retain twenty acres (20) surrounding each well drilled pursuant to this lease and which is capable of producing oil and/or gas . . . .").  It also appeared earlier in the trial court's 2014 preliminary injunction ruling, where the court observed that "[i]t follows logically" from the Shut-In Royalty "that if no shut-in gas royalties are paid and the wells are capable of production, then the Lease[s] terminate[]." *See SLT Holdings, LLC v. Mitch-Well Energy, Inc.*, 217 A.3d 1258, 1265 (Pa. Super. 2019) (quoting Tr. Ct. Op., 2/14/2014, at 3).  For these reasons, the Majority is incorrect to insist categorically that "the trial court did not address" these matters, and also appears to miss my point in suggesting that I propose "to resolve the breach of contract claim" of whole cloth.  Maj. Op. at 13 n.9.  I would recognize termination in this posture because it harmonizes the trial court's repeated commentary with the unambiguous terms of the contract that sustain those observations.  The interpretation of an unambiguous contract is a question of law within our purview, and also is amenable of summary disposition, something Lessees expressly invited.  I recognize that my approach would not entirely end the matter, and explain as much below. But it disserves the interests of justice to invite additional papering and argument, at risk of considerable additional delay, simply to return to the conclusions that Lessees sought and the trial court drew for sound reasons.

clearly concluded that the Leases were terminated. To require it to tolerate additional proceedings to confirm what has already been admitted and repeat what it has already found would be the hollowest of exercises, while Lessors' rights languish.

That is not to say there is nothing left to determine on remand. In finding that this case hinges upon the law of contract rather than abandonment, and that contract law leads to summary judgment for Lessors, that leaves open the question of what if any remedies are available beyond termination of the Leases. The trial court's observations regarding relief are not readily adapted to a narrower contract-based resolution. For example, the trial court found that Lessees were not entitled to take ownership of a certain number of acres immediately surrounding the two shuttered wells, but that conclusion was substantially informed by abandonment and consequent nullification of the Leases. Termination is not nullification. Whether the trial court would deny Lessees this acreage in the context of a termination-driven ruling requires further development.[20]

The trial court also based its ruling on conversion upon its finding of abandonment and nullification of the Leases.[21] But if the Leases were terminated rather than abandoned, then when Lessees emptied the storage tank on the McLaughlin Property, they may well have had a legal right to the tank's contents, leaving Lessors entitled only to royalties. Thus, I would reverse the lower court's affirmance of the trial court's entry of summary judgment on conversion.

---

[20]     *Cf.* Tr. Ct. Op., 1/9/2018, at 4 (describing several irregularities and uncertainty with respect to the retained-acreage provision).

[21]     *Id.* at 7-8.

In any event, to find that the parties in this case entered into Leases sufficient to fully address how default under the Leases must be rectified must not be taken to diminish the importance of the implied covenant of production and equitable abandonment to an area of commerce rife with the risk of asymmetrical bargaining power and fraught with unscrupulous dealings, where one misstep may invite what amounts to indefinite squatting on valuable mineral rights.[22] Where, as here, a mineral lease opens with a clear assurance that the intent of the parties is to maintain a partnership contingent upon the active exploitation of sub-surface minerals,[23] but contains no express provision for the contingency that the lessee simply absconds, the law must retain some equitable means to disencumber the fee owner's mineral rights. Were there no Shut-In Royalty provisions in the Leases in this case, I would conclude not only that Lessees abandoned their leaseholds as a matter of equity, but that they did so intentionally, making this the rare case that merits the entry of summary judgment for the lessor.[24]

---

[22] *See generally* Ann M. Eisenberg, *Land Shark at the Door? Why & How States Should Regulate Landmen*, 27 FORDHAM ENVTL. L. REV. 157 (2016).

[23] *See* McLaughlin Lease at 1, ¶ 1 ("Lessor hereby grants exclusively to Lessee, its successors and assigns, for the purpose of exploring for, developing, producing and marketing oil and gas . . . a lease on the following described land . . . .").

[24] *See Aye v. Phila. Co.*, 44 A. 555, 556 (Pa. 1899) ("An unexplained cessation of [drilling] operations for the [four-year] period involved in this case gives rise to a fair presumption of abandonment, and, standing alone and admitted, would justify the court in declaring an abandonment as [a] matter of law. But it may be capable of an explanation, and is therefore usually a question for the jury on the evidence of the acts and declarations of the parties."); *see also Clark v. Wright*, 166 A. 775, 777 (Pa. 1933) ("Under a lease of this character appellants' acts show an intention to surrender. This intention was effectuated by withdrawal from the premises. The failure of appellants' market is not a sufficient explanation of their withdrawal, for it appears that there was a market for the gas had they been willing to expend a reasonable sum to procure it.").

But that is not the case before us. In keeping with *Hutchinson*, I must conclude that the Leases govern their own continuing effect or termination. I simply disagree that termination remains an open question on remand. Accordingly, I would affirm the lower courts' rulings just insofar as they effected termination of the Leases under their own terms, and remand to address conversion and any remedies available in addition to declaratory judgment on the termination question.